LYNN ENGLEMAN, APPELLANT, V. NEBRASKA PUBLIC POWER DISTRICT, THIRD-PARTY PLAINTIFF, AND FLOYD ENGLEMAN, THIRD-PARTY DEFENDANT, APPELLEES.
KENTON D. SCHAUB, APPELLANT, V. NEBRASKA PUBLIC POWER DISTRICT, THIRD-PARTY PLAINTIFF, AND FLOYD ENGLEMAN, THIRD-PARTY DEFENDANT, APPELLEES.
RUTH ENGLEMAN, PERSONAL REPRESENTATIVE OF THE ESTATE OF DONALD ENGLEMAN, DECEASED, APPELLANT, V. NEBRASKA PUBLIC POWER DISTRICT, THIRD-PARTY PLAINTIFF, AND FLOYD ENGLEMAN, THIRD-PARTY DEFENDANT, APPELLEES.

424 N.W.2d 596

Filed June 17, 1988.    Nos. 86-580, 86-581, 86-582.

Robert D. Kinsey, Jr., and William W. Mickle II of Nelson & Harding, for appellants Ruth Engleman and Kenton Schaub.

James R. Hancock of Hancock & Denton, P.C., for appellant Lynn Engleman.

Francis L. Winner of Winner, Nichols, Douglas, Kelly and Arfmann, for appellee Nebraska Public Power Dist.

Leland K. Kovarik of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellee Floyd Engleman.

HASTINGS, C.J., CAPORALE, GRANT, and FAHRNBRUCH, JJ., and CHEUVRONT, D.J.

FAHRNBRUCH, J.

Plaintiffs in these three consolidated cases appeal the trial court's dismissal of their claims for damages arising out of the death of one man and injuries to two others when the grain auger they were moving came in contact with a 7,200-volt powerline. We affirm.

Donald Engleman was killed and Kenton D. Schaub and Lynn Engleman were injured in the accident on the Floyd Engleman farm near Mitchell, Nebraska. Floyd Engleman is the father of Lynn Engleman and younger brother of Donald Engleman, whose suit was brought by his wife, Ruth Engleman, as personal representative of Donald's estate. Schaub was a friend of the Englemans. Hereafter, for clarity, the Englemans will be referred to by their first names.

The powerline was installed, owned, and maintained by the defendant Nebraska Public Power District (NPPD). In the petitions, each plaintiff alleged that NPPD was negligent (1) in failing to warn the plaintiffs of the dangers incident to contacting a high-voltage powerline, (2) in failing to provide safe electrical current to the Engleman farm by use of insulated overhead conductors or by use of underground conductors, and (3) in its placement and maintenance of the high-voltage line on the Engleman farm. Schaub and Donald also alleged that NPPD was negligent in failing to provide low-voltage conductors to the farm rather than the high-voltage line.

In its answers, NPPD denied liability and alleged that the death and injuries were caused by the negligence of the decedent, the injured parties, and Floyd, whom NPPD named a third-party defendant. NPPD claimed that the decedent and injured men were contributorily negligent by not cranking down the auger, thereby permitting the auger to come into

contact with a powerline, and by failing to move the auger via a safe route. NPPD also claimed that the plaintiffs assumed the risk of injury or death when they pushed the auger into the wire, but that issue is not before this court.

After the plaintiffs adduced evidence and rested, the trial court directed verdicts in favor of the defendants, NPPD and Floyd, and dismissed the plaintiffs' petitions.

Originally, the plaintiffs filed their claims with the defendant NPPD under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. §§ 23-2401 et seq. (Reissue 1983). The claims were denied. The plaintiffs then filed their cases in the Scotts Bluff County District Court.

The appeals for Donald and Schaub assign five errors, which may be summarized as the district court's erring in directing verdicts for the defendants and in prohibiting Dr. William Hanna from testifying as an expert witness. Lynn adopted the other two plaintiffs' assignments of error and added others which, when narrowed, claim the district court failed to determine the degree of defendant NPPD's negligence as compared to the plaintiff's negligence.

At the time of the accident, 7,200 volts of power were supplied to the Engleman farm by lines from a pole near the farmstead's east boundary. The lines connected with a transformer on a pole in the center of the farmstead. From there, lower voltage power was distributed to the home, a shop/garage, a scale house, a stock handler, and a feed and storage building. The 7,200-volt line was installed on the Engleman farm in October 1978. Before that, the farm was served by a 220-volt line.

On the morning of October 16, 1983, Donald and Schaub went into Sweet Alice's cafe, which is located between Gering and Scottsbluff, Nebraska. Floyd and his wife were eating breakfast there. Floyd invited Donald to help him process cattle. Shortly thereafter, Floyd and his wife returned to their farm and began processing their cattle. Donald arrived about a half hour later and helped transport the cattle, after they were processed, to a pen.

While Donald was transporting the cattle, two or three trucks arrived and corn was dumped on the ground, since

Floyd's grain bins were full. Floyd asked Donald if he would help move a grain auger so the corn could be piled in the front yard of the farmstead. The upper end of the 60-foot auger was in a circular grain bin. The auger's lower end was on a concrete slab near the bin.

Meanwhile, Schaub arrived at the farm and overheard the conversation about moving the auger. He attempted to disengage its power take-off attachment from a tractor but was unable to separate the auger and tractor. He did, however, crank up the auger so its upper end would clear the top of the grain bin.

Floyd disengaged the power take-off and swung the lower end of the auger around. Donald suggested the auger be moved with the tractor. Floyd said it would be quicker to move the auger by hand. Donald moved the tractor away from the auger. Lynn, although he farmed elsewhere, lived with his parents. Lynn was talking to Schaub when Floyd said: "Let's move the auger." Lynn positioned himself on the low end of the auger and was the first to grab it. Floyd took hold of the auger behind Lynn. Donald was positioned opposite Lynn. Schaub was behind Donald.

The four men pulled the auger's lower end underneath the 7,200-volt wire. Although it was possible to do so, the auger's upper end was not depressed sufficiently to clear contact with the powerline. The auger could have been depressed so that it would have been no higher than 5 feet above the ground at its highest point. That would have given the auger more than 16 feet of clearance under the powerline.

When the auger had been moved 40 to 50 feet to the south, Floyd saw Donald and Lynn fall to the ground. Although Lynn fell to the ground, his right hand was still in contact with the auger. Floyd observed Schaub thrown from the auger. When he saw sparks coming from Lynn, Floyd realized that the upper portion of the auger had made contact with the 7,200-volt line. Floyd was unaffected because he was wearing gloves and rubber-soled shoes without any nails in them.

Floyd moved Lynn away from the auger and administered first aid to him. Floyd then attempted to revive Donald. Schaub ran to the farmhouse and telephoned for help. An ambulance

arrived and transported Donald and Lynn to a hospital, where Donald was pronounced dead. It is unclear whether Schaub was admitted to the hospital. Because the trial was bifurcated as to liability and damages, the full extent of Schaub's and Lynn's injuries is not disclosed in the record.

After the auger was moved away from the phase or "hot" line, an NPPD line superintendent measured the distance from the ground to the point on the line where the auger had made contact. That distance was 21 feet 3¹/₂ inches. Although not measured, the neutral line was higher than the phase line. At the time of the accident, the specifications book used by NPPD in determining how high a wire should be tracked the National Electrical Safety Code. Recommended clearance from the ground for a wire such as the one at issue was 20 feet 9 inches.

The evidence reflects that the powerline and the transformer and its pole were open and obvious to anyone entering the farm. The auger contained a warning sign which stated, "DANGER; Electrocution Hazard. This Machine is not Insulated. Keep away from overhead electric wires and devices. Failure to do so will result in serious injury or death." Additionally, the auger contained another cautionary sign which stated in part, "lower machine below level of power lines before moving." Although Floyd testified that corn dust covered the warnings, a photo taken shortly after the accident and received in evidence, exhibit 36, reflects that the warnings were visible.

In sustaining a motion to dismiss, the trial court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987). See, also, *Cimino v. W. A. Piel, Inc.*, 227 Neb. 196, 416 N.W.2d 505 (1987). In considering the evidence for the purpose of ruling on a motion to dismiss, the party against whom the motion is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Tiede v. Loup Power Dist., supra*; *Herman*

*v. Bonanza Bldgs., Inc.*, 223 Neb. 474, 390 N.W.2d 536 (1986); *Kahrhoff v. Kohl*, 219 Neb. 742, 366 N.W.2d 128 (1985).

A power company engaged in the transmission of electricity is required to exercise reasonable care in the construction and maintenance of its lines. *Tiede v. Loup Power Dist., supra*; *Rodgers v. Chimney Rock P.P. Dist.*, 216 Neb. 666, 345 N.W.2d 12 (1984); *Roos v. Consumers Public Power Dist.*, 171 Neb. 563, 106 N.W.2d 871 (1961).

The degree of care varies with the circumstances, but it must be commensurate with the dangers involved, and where wires are designed to carry electricity of high voltage, the law imposes the duty to exercise the utmost care and prudence consistent with the practical operation of the power company's business to avoid injury to persons and property. However, power companies are not insurers and are not liable for damages in the absence of negligence. *Tiede v. Loup Power Dist., supra*; *Suarez v. Omaha P.P. Dist.*, 218 Neb. 4, 352 N.W.2d 157 (1984); *Rodgers v. Chimney Rock P.P. Dist., supra*.

The principal basis for determining the liability of a power company for injuries resulting from contact between its wires and a movable machine is the foreseeability of a situation's arising which might lead to such injuries. Where circumstances are such that the probability of danger to persons having the right to be near an electrical line is reasonably foreseeable, power companies may be held liable for injury or death resulting from contact between the powerline and a movable machine. *Tiede v. Loup Power Dist., supra*; *Gillotte v. Omaha Public Power Dist.*, 185 Neb. 296, 176 N.W.2d 24 (1970).

Power companies must anticipate and guard against events which may reasonably be expected to occur, and the failure to do so is negligence. *Tiede v. Loup Power Dist., supra*; *Suarez v. Omaha P.P. Dist., supra*; *Rodgers v. Chimney Rock P.P. Dist., supra*; *Gillotte v. Omaha Public Power Dist., supra*; *Roos v. Consumers Public Power Dist., supra*.

The trial court, in directing verdicts in favor of NPPD and Floyd, found that Lynn, Donald, and Schaub were "guilty of negligence and contributory negligence." That NPPD was negligent in installing and maintaining the 7,200-volt line on Floyd's farm is inherent in those findings. But our inquiry does

not end there.

It becomes necessary to determine whether Lynn, Donald, and Schaub were each negligent in a degree sufficient to bar recovery of damages as a matter of law. The trial judge held that they were. That means that by comparison each plaintiff's negligence was more than slight and that each defendant's negligence was less than gross. See, Neb. Rev. Stat. § 25-21,185 (Reissue 1985); *C. C. Natvig's Sons, Inc. v. Summers*, 198 Neb. 741, 255 N.W.2d 272 (1977). "Contributory negligence is conduct for which the plaintiff is responsible, amounting to a breach of the duty imposed upon persons to protect themselves from injury and which, concurring with actionable negligence on the part of the defendant, is a proximate cause of injury." *Phillips v. City of Omaha*, 227 Neb. 233, 238-39, 417 N.W.2d 12, 16 (1987); *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987); *McMullin Transfer v. State*, 225 Neb. 109, 402 N.W.2d 878 (1987).

Upon review in the Supreme Court, the findings of fact of the trial court in a proceeding under the Political Subdivisions Tort Claims Act will not be disturbed unless they are clearly wrong. *Steinauer v. Sarpy County*, 217 Neb. 830, 353 N.W.2d 715 (1984); *Rodgers v. Chimney Rock P.P. Dist., supra.*

We cannot say that the trial court was clearly wrong in finding that Lynn, Donald, and Schaub were contributorily negligent in a degree more than slight. Nor can we say that the trial court was clearly wrong in finding that NPPD's negligence was less than gross when compared to the negligence of the decedent and injured men.

One who is capable of understanding and discretion but who fails to exercise ordinary care and prudence to avoid defects and dangers which are open and obvious is negligent or contributorily negligent. *Tiede v. Loup Power Dist., supra*; *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987).

To constitute want of due care on the plaintiff's part, it is not necessary that he or she have anticipated the exact risk which occurred or that the peril was a deadly one; it is sufficient that the plaintiff knew or should have known that substantial injury was likely to result from his or her act. *Tiede v. Loup Power*

*Dist., supra; Utsumi v. City of Grand Island,* 221 Neb. 783, 381 N.W.2d 102 (1986); *Rodgers v. Chimney Rock P.P. Dist.,* 216 Neb. 666, 345 N.W.2d 12 (1984). One who has notice of a dangerous condition of a wire or other electrical appliance and voluntarily or recklessly brings himself or herself into contact with it, as by touching it with conductors of electricity, is guilty of negligence and cannot hold the power company liable for the resulting injury, and this is true even of an adult who is wholly unskilled in the handling of electricity. *Tiede v. Loup Power Dist., supra; Rodgers v. Chimney Rock P.P. Dist., supra; Disney v. Butler County Rural P. P. Dist.,* 183 Neb. 420, 160 N.W.2d 757 (1968).

In the present case, the evidence shows that the wire conductors at issue were open and obvious to anyone entering the Engleman farm. Plaintiffs called a psychologist, who testified as an expert in human factors. She stated that Donald, Lynn, and Schaub knew at the time they were moving the auger that the powerlines were there and were dangerous, but "forgot" about them. They made an "error of omission," the expert said.

Lynn lived on Floyd's farm and knew before October 16, 1983, that the wires between the transformer pole and tap pole were electric wires. He also knew that if an auger he was working with came in contact with an overhead powerline, there was a good chance of being killed by electrocution. Lynn further admitted he helped move an auger under the electric line in question on occasion before October 16, 1983. However, before moving the auger prior to October 16, 1983, it was cranked down sufficiently to clear the powerline.

Schaub testified that during the 3 years before the accident, he had been on Floyd's farm some 45 to 90 times. He had also done painting and shingling on the farm's buildings. Before October 16, 1983, Schaub had noticed power poles and electric wires in the farmyard. He said he knew that electricity is dangerous and can either kill or seriously injure a person if an electrical conductor is touched.

Before his electrocution, Donald visited Floyd's farm about once a month for 5 years. In addition, he hauled cattle from the farm once or twice a year. During the periods Donald was on the

farm, the electrical overhead powerlines were open and obvious to view. In fact, he drove underneath them. As stated by the human factors expert, when the auger was being moved, Donald knew the powerlines were there and that they were dangerous. He forgot about them.

In several cases, this court has held that a plaintiff's knowledge of the existence of a high-voltage electrical line coupled with a plaintiff's contact with that line constitutes negligence sufficient to bar recovery as a matter of law. *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987). At a minimum, the causes of action involving Donald, Lynn, and Schaub fall within that category of cases.

Considering that the powerlines and transformer on Floyd's farm were open and obvious; that Donald, Schaub, and Lynn were familiar with the farm; that they all knew the powerlines were there and were dangerous; and that they failed to lower the auger sufficiently to clear the powerlines or to move the auger on a route that would be safe; we cannot say the trial judge was clearly wrong in finding the decedent and injured men negligent in a degree sufficient to bar them recovery as a matter of law. The record reflects that Donald, Lynn, and Schaub individually and collectively breached their duty to protect themselves from injury. *Tiede v. Loup Power Dist., supra*; *McMullin Transfer v. State*, 225 Neb. 109, 402 N.W.2d 878 (1987).

With respect to Lynn's assignment of error regarding the degree of negligence of the parties, the district court did make a comparative finding. Inherent in the trial court's finding that the contributory negligence of Donald, Lynn, and Schaub barred recovery as a matter of law are the further findings (1) that each defendant was negligent and (2) that each plaintiff's contributory negligence was more than slight and each defendant's negligence was less than gross when the parties' negligence is compared. The trial court was not clearly wrong in those findings.

In rejecting the expert testimony of Dr. William Hanna, the trial judge found that it would be unfair to permit him to testify as an expert. This was because the plaintiffs failed to notify NPPD that they would call Dr. Hanna as an expert until the

Friday before the trial, which started on the following Monday. The judge found that was too late for NPPD to prepare interrogatories or deposition for such testimony. The plaintiffs did not reveal at the pretrial conference that they would call Dr. Hanna as an *expert* witness.

"The trial court has discretionary power to exclude the testimony of a witness whose identity is deliberately withheld in discovery under proper circumstances. The trial court would also have discretion to impose an alternative sanction to effectively protect against harm due to lack of prior knowledge of the witness, such as continuing the hearing or deferring the questioning of such a witness. The object of the rule requiring the disclosure of the names of witnesses before trial is to enable the parties to discover the truth and eliminate surprise, and, dependent on the facts, the overall policy of discovering all the truth, in some circumstances, might be more adequately served by permitting testimony after postponement until the element of surprise has been eliminated. These matters, however, are primarily within the broad discretion of the trial court."

*Priest v. McConnell*, 219 Neb. 328, 332, 363 N.W.2d 173, 176 (1985); *Cardenas v. Peterson Bean Co.*, 180 Neb. 605, 144 N.W.2d 154 (1966).

' The trial judge found that in the interest of justice, Dr. Hanna's expert testimony should not be allowed. Under the circumstances shown in the record, the trial judge did not abuse his discretion. Therefore, the assignment of error regarding Dr. Hanna's expert testimony is without merit.

We have considered all of the appellants' assignments of error and find they have no merit. Therefore, the dismissal of all three cases by the trial court after the plaintiffs adduced evidence and rested should be affirmed.

AFFIRMED.