GEORGE E. DITLOFF, PERSONAL REPRESENTATIVE OF THE ESTATE OF MACK J. DITLOFF, DECEASED, APPELLEE, V. LOGAN M. OTTO, JR., APPELLANT.

476 N.W.2d 675

Filed November 1, 1991.   No. 89-370.

William D. Sutter, of Barlow, Johnson, DeMars & Flodman, for appellant.

Gary J. Nedved, of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

George E. Ditloff, as personal representative of the estate of Mack J. Ditloff, deceased (Ditloff), brought a wrongful death action against Logan M. Otto, Jr., in the district court for York County. The claim involved Ditloff's electrocution death, which occurred when a metal grain auger conveyor, being manually moved by Ditloff and Otto, came in contact with an

overhead high-voltage line which delivered electricity to the Otto farmstead.

The negligence claim was based on Otto's failure to warn Ditloff about the overhead wire and keep a proper lookout for the wire while Ditloff and Otto were moving the auger, and on Otto's "moving the auger and letting go of the auger so as to cause it to come into contact with the electric lines." In defense, Otto asserted that Ditloff was contributorily negligent in a manner and degree such that recovery was denied as a matter of law, since Ditloff did not maintain proper lookout for the electric line and moved the auger so that it came in contact with that line.

After Otto's motion for a directed verdict at the conclusion of all evidence, the court overruled Otto's directed verdict motion and submitted the case to the jury. However, after deliberation and a 7 to 5 deadlock, the jury reported that it could not reach a verdict and, for that reason, was discharged by the court. Otto then filed a motion pursuant to Neb. Rev. Stat. § 25-1315.02 (Reissue 1989), which provides in pertinent part:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. . . . [I]f a verdict was not returned [a party who had been denied a directed verdict], within ten days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. . . . If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

The district court denied Otto's motion for judgment; hence, Otto's appeal and contention that, as a matter of law, Otto is entitled to judgment in the wrongful death action.

Section 25-1315.02 is ordinarily used to support a party's motion for a new trial or judgment notwithstanding an adverse jury verdict. See, *Getzschman v. Miller Chemical Co.*, 232 Neb. 885, 443 N.W.2d 260 (1989); *Dunn v. Hemberger*, 230 Neb. 171, 430 N.W.2d 516 (1988); *Lockhart v. Continental Cheese,*

*Inc.*, 203 Neb. 331, 278 N.W.2d 604 (1979). However, after a motion for directed verdict at the close of all evidence has been denied by the trial court, § 25-1315.02 also authorizes a motion for judgment in accordance with the directed verdict motion, when a jury is unable to reach a verdict and is discharged accordingly. See, *Danielsen v. Richards Mfg. Co., Inc.*, 206 Neb. 676, 294 N.W.2d 858 (1980); *Bailey v. Williams*, 189 Neb. 484, 203 N.W.2d 454 (1973); *In re Estate of Fehrenkamp*, 154 Neb. 488, 48 N.W.2d 421 (1951).

Neb. Rev. Stat. § 25-1315.03 (Reissue 1989) states:

An order entering judgment, as provided in section 25-1315.02, or granting or denying a new trial, is an appealable order. The time for and manner of taking such appeal shall be as in an appeal from a judgment, decree, or final order of the district court in a civil action. The Supreme Court on appeal from an order granting a new trial, or upon review of an order denying a new trial in the action in which such motion was made, or an appeal from the judgment, may order and direct judgment to be entered in favor of the party who was entitled to such judgment.

Although the language in § 25-1315.03 authorizes an appeal from an order (1) granting a new trial, (2) denying a new trial, or (3) granting judgment notwithstanding the verdict, this court has held that the list of appealable orders mentioned in § 25-1315.03 is neither complete nor exhaustive, see *Edquist v. Commercial Sav. & Loan Assn.*, 191 Neb. 618, 217 N.W.2d 82 (1974), and has construed § 25-1315.03 as authorization for an appeal from denial of a judgment after a motion for directed verdict, made at the close of all evidence, has been denied by a trial court and the jury has been discharged as the result of inability to reach a verdict. See, *Danielsen v. Richards Mfg. Co., Inc., supra*; *Bailey v. Williams, supra*; *In re Estate of Fehrenkamp, supra*. As we stated in *Fehrenkamp, supra* at 491, 48 N.W.2d at 424:

"[S]ection 25-1315.03, R.R.S. 1943, vests the power here on appeal to review the action taken by the trial court *in any action* taken under section 25-1315.02, R.R.S. 1943, and to enter here the judgment in favor of the party who

was entitled to the judgment in the trial court." . . . The appeal brings here all matters which were considered by the trial court and which were in effect determined by the trial court under section 25-1315.02, R.R.S. 1943.

(Emphasis in original.) (Quoting *Krepcik v. Interstate Transit Lines*, 153 Neb. 98, 43 N.W.2d 609 (1950).) Hence, denial of a judgment authorized by § 25-1315.02 is an appealable order.

## STANDARD OF REVIEW

The standard of review for the appeal of a trial court's denial of judgment pursuant to § 25-1315.02 is the same standard used in an appeal from denial of a motion for directed verdict: "A party against whom [a motion for directed verdict or] a motion to dismiss is directed is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence." *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 489 (1989). Accord, *Dale v. Thomas Funeral Home*, 237 Neb. 528, 466 N.W.2d 805 (1991); *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988); *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987). Consequently, a party against whom a judgment is sought pursuant to § 25-1315.02 is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence.

Moreover,

[a] court cannot decide an issue as a matter of law unless the facts adduced on an issue are such that reasonable minds can draw but one conclusion from the evidence. . . . In a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court can properly direct a verdict on such issue or question.

*Anderson v. Union Pacific RR. Co., supra* at 323, 426 N.W.2d at 519. Accord, *Burns v. Veterans of Foreign Wars, supra*; *Rahmig v. Mosley Machinery Co., supra*.

Contributory negligence exists when (1) one fails to protect herself or himself from injury, (2) one's conduct concurs and

cooperates with the defendant's actionable negligence, and (3) one's conduct contributes to her or his own injuries as a proximate cause. *Burns v. Veterans of Foreign Wars, supra*; *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987). Accord, *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990). See, also, *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 423 N.W.2d 115 (1988).

> "One who is capable of understanding and discretion but fails to exercise ordinary care and prudence to avoid obvious dangers is negligent or contributorily negligent." . . . "To determine whether ,conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in conduct and may vary depending on the circumstances."

*Rahmig v. Mosley Machinery Co., supra* at 452, 412 N.W.2d at 75 (quoting *Lynn v. Metropolitan Utilities Dist., supra*). Accord, *Sikyta v. Arrow Stage Lines, supra*; *Anderson v. Union Pacific RR. Co., supra*.

As we expressed in *Holden v. Urban*, 224 Neb. 472, 475, 398 N.W.2d 699, 701 (1987):

> Foreseeability is a factor in establishing a defendant's duty, or, as expressed by Justice Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916): "[F]oresight of the consequences involves the creation of a duty . . . ." See, also, *Lock v. Packard Flying Service, Inc.*, 185 Neb. 71, 73, 173 N.W.2d 516, 518 (1970): " 'Foresight, not retrospect, is the standard of diligence. . . .' " (Citing and quoting from *Kolar v. Divis*, 179 Neb. 756, 140 N.W.2d 658 (1966).)

Accord *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988).

> [I]n a jury trial of a negligence action, the trial court must decide whether a plaintiff is guilty of negligence, and, if so, must then decide whether evidence is such that only one reasonable conclusion is permissible—the plaintiff's contributory negligence which, as a matter or law, bars

recovery and authorizes a directed verdict for the defendant. [Citations omitted.] If, as the result of such initial consideration of the evidence, the trial court determines that the jurors may reasonably draw different conclusions from the evidence, existence of the plaintiff's negligence or contributory negligence and comparative negligence are questions of fact for the jury.

*Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 451, 412 N.W.2d 56, 75 (1987).

Therefore, we must determine whether, based on the evidence in the record presented to us, there is but one reasonable conclusion: Ditloff was contributorily negligent to such an extent or degree that, as a matter of law, recovery is denied in the action against Otto.

## THE ACCIDENT

Ditloff, 24 years old, was engaged in general farming operations with his family and used metal augers to store grain in bins. Electrical service for the Ditloff operations was provided by underground wires. Also, Ditloff was a custom combiner, who contracted with Otto for cornpicking in the fall of 1984. However, the custom combining contract did not require Ditloff to put the picked corn into Otto's storage bins; rather, Otto was responsible for placing the harvested crop in the bins. Nevertheless, Ditloff agreed to help Otto in storing the corn in bins near the field harvested.

Otto's storage bins were located near a county road. East-west aerial wires, one carrying 7,200 volts, ran between the county road and the storage bins at the south edge of the Otto property. Poles suspended the clearly visible powerline, with its upper wire, which carried the eventually fatal electricity, 31 feet above ground level.

During the extremely damp morning of October 14, 1984, Ditloff, who had never previously been at the bin site, entered the Otto property via the driveway, where he met Otto, who planned to put corn in one of the steel bins adjacent to the powerline. The bin was 27 feet tall, with a diameter of 26 feet. The bin's roof was conical, with an aperture centered at the apex of the bin. The edge of the bin was 3½ feet from the

powerline, while the hole in the bin's roof was 16¹/₂ feet from the powerline. Otto planned to use a metal auger for lifting the corn from ground level to the top of the bin for insertion through the bin's rooftop opening.

The auger actually used is depicted in the following photograph, taken shortly after the accident.

The rigid single-section auger was 57 feet from its head to the opposite end and weighed 1,630 pounds, which included 130 pounds for an electric motor on the auger at a point near the V-brace and toward the bottom of the auger. Raising the auger's head was accomplished by use of a handcrank, located near the bottom of the auger, to retract the brace nearest the spout, reducing the angle at the auger's wheels and thereby elevating the spout. Height of the auger's head was decreased by reversing the process described. Grain entered the auger through an inlet at the bottom of the auger, shown at the lower right of the photograph, and proceeded by an internal elevator to the spout

through which corn would be poured into the granary. When the auger's forward brace was almost fully retracted with the grain inlet on the ground, which was the situation before Ditloff and Otto started moving the auger, the head of the auger was 31 feet above ground level.

The earth around the bin selected by Otto was relatively soft. To move the auger toward the selected bin, Ditloff positioned himself near the bracing, somewhere behind the wheels and toward the auger's inlet. From that position, Ditloff pushed the auger and supplied locomotion for the auger's movement across the ground. At the auger's inlet, 20 feet from the wheels, was Otto, who was able to somewhat control the height of the auger's head by lifting or dropping the bottom of the auger. Also, the auger's lateral movement, that is, movement from side to side, was achieved by manipulation of the bottom of the auger in one direction, causing the auger to pivot on its wheels at the bracing and resulting in a corresponding movement of the auger's head in a direction opposite to that in which the bottom of the auger was moving. The auger's length and weight, coupled with the soft surface, made movement of the auger difficult.

The first effort by Ditloff and Otto to align the auger's spout with the bin's rooftop entry was unsuccessful. Ditloff then placed boards on the ground, which indicated the estimated location for the wheels of the fully elevated auger so that the auger's spout would be above the hole in the bin's roof. With Ditloff positioned at the bracing area and Otto lifting the bottom of the auger, the pair jockeyed the auger toward the location for suitable alignment of the auger and bin. During this second attempt, the auger's head swung about 10 to 20 feet toward the south and the powerline. As the auger's head came close to the powerline, Otto suddenly noticed the auger's approach to the line, immediately let go of the auger, and allowed the bottom of the auger to drop to the ground, elevating the auger's head and bringing it in contact with the powerline while Ditloff was still in contact with the bracing area. The electrical charge transmitted through the auger caused Ditloff's virtually immediate death by electrocution.

Alexander R. Peters, a professor of mechanical engineering

with expertise in the analysis of movement and forces, testified for the plaintiff. Peters had personally inspected the fatal auger, obtained information about all the auger's features, and visited the electrocution site. According to Peters, in view of the auger's center of gravity, center of mass, and the "lever arm principle" for mechanical advantage, a person at the bottom of the auger could not provide impetus in the auger's movement across a surface, but controlled the auger's "swing" or direction as well as the general elevation of the auger's head. Locomotion for the auger's surface movement was supplied by someone in the auger's bracing area who pushed, but was unable to control the auger's left-right or up-down movements. Peters described the auger's overall movement during efforts by Ditloff and Otto:

> Well, it is like a teeter-totter. If the lower end is lifted the upper end is lower and when you release the lower end it comes to the ground, the upper end has contact with the wire so if he had not released it the wire would not have been contacted.

## DISCUSSION

We cannot state that, by itself, contact with an electric powerline automatically and as a matter of law establishes contributory negligence on the part of one injured or killed by contact with the powerline. Contributory negligence must always be examined in the light of the particular facts in each case. The duty to make this examination and determination concerning contributory negligence properly belongs to the fact finder unless the evidence compels only one conclusion about which reasonable jurors cannot disagree. See *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987). Nevertheless, this court has considered several accidental electrocution cases which involved conduct characterized as contributory negligence as a matter of law and, therefore, a bar to recovery against an electric utility or transmission company. See, *Engleman v. Nebraska Public Power Dist.*, 228 Neb. 788, 424 N.W.2d 596 (1988) (moving a grain auger into contact with an open and obvious powerline despite multiple warnings); *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987) (decedent had warned others and was fully aware of the

danger, yet moved grain auger into powerline from an unsafe direction); *Rodgers v. Chimney Rock P.P. Dist.*, 216 Neb. 666, 345 N.W.2d 12 (1984) (decedent brought a 30-foot well-cleaning tube into contact with a powerline located above a well on his property); *Omaha Nat. Bank v. Omaha P. P. Dist.*, 186 Neb. 6, 180 N.W.2d 229 (1970) (decedent had complained about a powerline located within 8 feet of a shed under construction and later touched powerline with a metal ladder); *Disney v. Butler County Rural P. P. Dist.*, 183 Neb. 420, 160 N.W.2d 757 (1968) (plaintiff towed an irrigation sprinkler arm into contact with a powerline located above his own driveway). However, Ditloff's case presents a pair who, through collaborative efforts, were attempting to accomplish a project which necessitated basically simultaneous actions by the participants.

As evidenced by the nearly even split among the jurors, who assimilated all the evidence and are a collective embodiment of "reasonable minds," a question or questions remained to be answered for resolution of the wrongful death action. From our review of the record in Ditloff's case, we note questions which are unanswered under the evidence. For example, should Ditloff have foreseen Otto's abrupt action in dropping the end of the auger behind Ditloff when Otto saw the auger's imminent contact with the powerline? Given their different roles and division of labor in moving the auger, could Ditloff reasonably rely on Otto's being careful in maneuvering the auger? If Ditloff's attention was focused on the desired position for the auger's wheels, marked by location of the boards by the bin, could Ditloff reasonably rely on Otto to provide an adequate warning for prospective contact with the powerline? Did Ditloff retain or relinquish control over the auger's direction? Was Ditloff reasonable in leaving the basic directional control for the auger to Otto?

The foregoing questions are not exhaustive or intended to determine the result in any trial of Ditloff's wrongful death action against Otto; rather, the suggested questions illustrate that the evidence is susceptible to various interpretations, which are properly for the fact finder. Hence, the district court correctly refused to enter judgment for Otto. For that reason, the district court's judgment is affirmed.

AFFIRMED.