684 N.W.2d 543 (2004)
268 Neb. 499
Susan K. PARKS, appellee,
v.
MERRILL, LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, appellant.
No. S-02-1293.
Supreme Court of Nebraska.
August 6, 2004.
*545 Mark E. Novotny and Robert A. Mooney, of Lamson, Dugan & Murray, Omaha, for appellant.
David S. Houghton, Robert W. Mullin, and William G. Garbina, of Lieben, Whitted, Houghton, Slowiaczek & Cavanaugh, P.C., L.L.O., Omaha, for appellee.
WRIGHT, CONNOLLY, GERRARD, and McCORMACK, JJ., and IRWIN, Chief Judge.
McCORMACK, J.

NATURE OF CASE
Appellee, Susan K. Parks, filed this action in the district court for Douglas County, *546 Nebraska, against Merrill, Lynch, Pierce, Fenner & Smith, Incorporated (Merrill Lynch), alleging breach of oral contract. The case was tried to a jury. After the jury returned deadlocked, the trial court declared a mistrial and Merrill Lynch submitted motions for judgment notwithstanding the verdict and for new trial and renewed its previous motion for directed verdict. In each of its respective motions, Merrill Lynch contended that Parks' claim was one of professional negligence, not breach of contract, and that her claim was barred by the applicable statute of limitations. The trial court overruled the motions and reset the matter for trial. Merrill Lynch appeals.

BACKGROUND
On December 29, 1997, Parks brought a breach of contract action against Merrill Lynch. In her amended petition, Parks alleged that in 1991, she entered into an oral agreement with Merrill Lynch, whereby she and her independent investment consultant orally directed Richard Kenton of Merrill Lynch to invest proceeds Parks received from an employee stock ownership plan (ESOP) in noncallable bonds. Parks further alleged that instead of purchasing noncallable bonds, Merrill Lynch purchased callable bonds. Callable bonds are ones for which the issuer retains the right to pay an amount, the "call" price, which redeems the debt, fully or partially, before the scheduled maturity date. See Black's Law Dictionary 204 (6th ed.1990). In her amended petition, Parks alleged that nine of the bonds purchased by Merrill Lynch were called on specified dates between January 1993 and June 2001. Parks alleged that as a proximate result of Merrill Lynch's breach, she sustained damages because of lost earnings on each bond and because she was forced to prematurely recognize income subject to income tax in those years.
Merrill Lynch filed a motion for summary judgment, alleging that all of Parks' claims were time barred by the statute of limitations applicable to either professional negligence or oral contract claims. The trial court overruled Merrill Lynch's motion in part, concluding that Neb.Rev.Stat. § 25-222 (Reissue 1995), the 2-year statute of limitations for professional negligence claims, was inapplicable. The court found that Merrill Lynch's agent, Kenton, who purchased the bonds in question for Parks, was not acting as a professional when he did so.
At trial, Parks testified that she had $800,000 from an ESOP as a result of her divorce. As part of the settlement agreement pursuant to the divorce, Parks sold her shares in a company called Millard Manufacturing to its ESOP for $800,000. Parks understood that she would have to do an ESOP rollover  i.e., reinvest the funds in qualified securities within a 12-month period after the sale  in order to defer paying capital gains taxes on the proceeds from her sale of stock in Millard Manufacturing.
Parks was contacted by Kenton about investment possibilities. Their first meeting occurred on September 18, 1991. Parks testified that during this meeting, Kenton told Parks he had experience with ESOP rollovers and gave Parks the impression that he had been a broker for a long period of time. Parks explained to Kenton that her primary goal was to make sure the money was safe and secure. Parks testified that Kenton suggested investing in bonds, a subject which Parks knew nothing about at the time. No decisions were made during this meeting.
Before their next meeting, Parks reviewed a book authored by Dr. Ravi Batra, an economist at Southern Methodist University. Specifically, she reviewed the criteria *547 Batra established in his book for safely investing in corporate bonds in an economic downturn. These included purchasing highly rated, AAA if possible, noncallable bonds. During her second meeting with Kenton, Parks told Kenton that she was concerned about the economy and that pursuant to the criteria set forth in Batra's book, she wanted to purchase AAA, noncallable, long-term bonds. Parks testified that she relied on Kenton's expertise only to ensure that the bonds he selected met her criteria that they be highly rated, long-term, noncallable bonds. She testified that she relied on Batra's book to establish her selection criteria, not on any recommendation Kenton may otherwise have made.
Parks paid Batra a consulting fee. Parks and Kenton had a conference call with Batra, and after the conference call, Parks directed Kenton to purchase the bonds they had previously settled upon pursuant to Parks' established criteria, which Kenton did on October 8, 1991. Parks testified that at no time prior to purchasing the bonds did Kenton or anyone from Merrill Lynch inform her that some of the bonds Kenton purchased were callable.
Several of Parks' bonds were eventually called. Shortly after Parks received notice that the first bond was called, she contacted Kenton and he explained that the called bond just "slipped through the cracks." Parks testified that as a result of these bonds being called, she was required to pay the income tax on the capital gains from the sale of her Millard Manufacturing stock to the ESOP.
At the close of Parks' evidence, Merrill Lynch moved for a directed verdict on the ground that Parks failed to prove breach of contract and that Parks' claim was really one for professional negligence. Merrill Lynch claimed that the professional negligence 2-year statute of limitations of § 25-222 applied. The trial court overruled the motion, finding, inter alia, that Parks obtained information regarding her strategy for accomplishing the ESOP rollover from outside sources and that Kenton had acted under Parks' direction rather than advising Parks in a professional capacity during his relationship with her.
Kenton testified that he attended Creighton University but did not complete his degree. After obtaining his insurance license and working as an insurance agent for a while, Kenton accepted a position as an "investment executive" with PaineWebber in 1981, where he worked for less than a year. His duties entailed attracting and offering clients investment products. He later worked for Piper Jaffray for 3 years until 1984, where he did the same type of work and received training as a financial advisor. Kenton testified that during his employment with these employers, he held a general securities license and that 10 to 20 percent of his work related to bonds. In order to obtain his general securities license, he was required to pass two examinations: a "series 7" or general securities representative examination, and the "blue sky" license examination, administered by the National Association of Security Dealers. See 48 Neb. Admin. Code, ch. 6, § 008 (2001) (specifying qualifying examinations for agents of broker-dealers). Kenton testified that the "series 7" examination was a full-day, 250-question test, and that the "blue sky" examination was shorter and less intense than the "series 7" examination.
Upon leaving Piper Jaffray, Kenton accepted employment with Equitable Life Insurance as an investment product coordinator and assistant manager. He testified that at Equitable Life Insurance, he worked primarily with mutual funds and variable annuities. Four years later, in *548 1988, Kenton went to work for Prudential doing the same kind of work he had performed at Equitable Life Insurance.
In 1991, Kenton accepted employment at Merrill Lynch as a trainee in a 2-year program. Kenton testified that at the time he handled Parks' bond transactions in 1991, he was still a trainee at Merrill Lynch, and that he had no previous experience with ESOP rollovers. As a trainee, Kenton assisted clients with their investments and received training regarding the same type of investment services he had provided with his previous employers.
Kenton testified that during his first meeting with Parks in September 1991, he did not tell Parks that he had experience with ESOP rollovers, but that he did tell Parks he had experience with retirement plan rollovers. After the meeting, Kenton contacted Merrill Lynch's tax advisory and fixed income departments for information. The fixed income department advised Kenton of Merrill Lynch's inventory of suitable bonds for ESOP rollovers. He testified that these bonds had a very long maturity and no call provisions.
Kenton's testimony generally controverted Parks' testimony that she directed him to purchase only noncallable bonds. At the conclusion of Merrill Lynch's evidence, Parks moved for a directed verdict and Merrill Lynch renewed its motion for directed verdict. The only ground for the directed verdict applicable to this appeal was that Kenton was acting as a professional and that, therefore, the 2-year statute of limitations of § 25-222 applied. Both of the motions for directed verdict were denied by the trial court. The matter was then submitted to the jury. Following deliberations, the jury informed the trial court that it was deadlocked. The trial court declared a mistrial and reset the case for trial. Both parties timely filed motions for judgment notwithstanding the verdict and for new trial. In its respective motion, Merrill Lynch reasserted its statute of limitations contentions previously asserted in its motion for directed verdict, and Parks reasserted her previous motion for directed verdict. The trial court overruled both parties' motions for judgment notwithstanding the verdict and for new trial and reset the matter for trial.

ASSIGNMENTS OF ERROR
Merrill Lynch assigns, consolidated and restated, that the trial court erred in (1) presenting the case to the jury as one for breach of contract rather than professional negligence and (2) overruling its motion for judgment notwithstanding the verdict and motions for directed verdict, failing to find that Parks' action was time barred by the statute of limitations applicable to (a) claims for professional negligence under § 25-222, (b) claims for ordinary negligence under Neb.Rev.Stat. § 25-207 (Reissue 1995), and (c) claims for breach of oral contract under Neb.Rev.Stat. § 25-206 (Reissue 1995).

STANDARD OF REVIEW
Which statute of limitations applies is a question of law that an appellate court must decide independently of the conclusion reached by the trial court. Jorgensen v. State Nat. Bank & Trust, 255 Neb. 241, 583 N.W.2d 331 (1998).
On a motion for judgment non obstante veredicto, or notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. Holmes v. Crossroads Joint Venture, 262 Neb. 98, 629 N.W.2d *549 511 (2001); Snyder v. Contemporary Obstetrics & Gyn., 258 Neb. 643, 605 N.W.2d 782 (2000). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. McClure v. Forsman, 266 Neb. 90, 662 N.W.2d 566 (2003).

ANALYSIS
We first observe that Neb.Rev.Stat. § § 25-1315.02 (Cum.Supp.2002) and 25-1315.03 (Reissue 1995) authorize an appeal from the denial of a judgment notwithstanding the verdict after the jury has been discharged as the result of an inability to reach a verdict. See, Snyder v. Contemporary Obstetrics & Gyn., supra; Critchfield v. McNamara, 248 Neb. 39, 532 N.W.2d 287 (1995). If a verdict is not returned, within 10 days after the jury is discharged, a party who has moved for a directed verdict may move for judgment in accordance with the moving party's motion for a directed verdict. § 25-1315.02. This appeal arises from the trial court's denial of Merrill Lynch's motion for judgment notwithstanding the verdict after the jury returned deadlocked and was subsequently discharged. Accordingly, this appeal is properly before this court.
Merrill Lynch contends that Parks' claim is really one for professional negligence rather than breach of contract and that, accordingly, the trial court should have applied the statute of limitations found in § 25-222. Where a party's claims are for professional malpractice, whether pled in tort or contract, the statute of limitations for professional negligence contained in § 25-222 applies. Egan v. Stoler, 265 Neb. 1, 653 N.W.2d 855 (2002); Reinke Mfg. Co. v. Hayes, 256 Neb. 442, 590 N.W.2d 380 (1999).
Section 25-222 provides:
Any action to recover damages based on alleged professional negligence or upon alleged breach of warranty in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action; Provided, if the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; and provided further, that in no event may any action be commenced to recover damages for professional negligence or breach of warranty in rendering or failure to render professional services more than ten years after the date of rendering or failure to render such professional service which provides the basis for the cause of action.
(Emphasis in original.)
In determining whether the special statute of limitations for professional negligence applies to a plaintiff's claims, we must determine whether the defendant is a professional and was acting in a professional capacity in rendering the services upon which the claim is based. Reinke Mfg. Co. v. Hayes, supra. In determining whether a particular act or service is professional in nature, we must look to the nature of the act or service itself and the circumstances under which it was performed. Id.
As this court has previously noted, "[t]he Legislature has not specifically stated which occupations are governed by § 25-222." Lawyers Title Ins. Corp. v. *550 Hoffman, 245 Neb. 507, 512, 513 N.W.2d 521, 524 (1994). In Jorgensen v. State Nat. Bank & Trust, 255 Neb. 241, 583 N.W.2d 331 (1998), we stated that the definition of "profession" for purposes of the professional negligence statute of limitations under § 25-222 is (1) a calling requiring specialized knowledge and often long and intensive preparation, including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods; (2) maintaining by force of organization or concerted opinion high standards of achievement and conduct, and (3) committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service. This definition was first adopted in Tylle v. Zoucha, 226 Neb. 476, 412 N.W.2d 438 (1987). In Tylle, we rejected a previous definition of profession based on a predominately mental or intellectual occupation, and further rejected criteria based on the "mere possession of a license." 226 Neb. at 480, 412 N.W.2d at 440. Instead, we emphasized that the new definition "stresses the long and intensive program of preparation to practice one's chosen occupation traditionally associated only with professions." Id. at 480, 412 N.W.2d at 441.
In Jorgensen v. State Nat. Bank & Trust, supra, we examined this court's line of cases addressing the issue of whether retirement planners are professionals for purposes of § 25-222. We recognized that we had held without analysis in earlier cases that the statute of limitations for professional negligence applied to retirement planners. See, Maloley v. Shearson Lehman Hutton, Inc., 246 Neb. 701, 523 N.W.2d 27 (1994); Educational Service Unit No. 3 v. Mammel, O., S., H. & S., Inc., 192 Neb. 431, 222 N.W.2d 125 (1974). However, Educational Service Unit No. 3 was decided before the Tylle definition "radically altered the criteria by which this court would determine whether an occupation was a profession." Jorgensen v. State Nat. Bank & Trust, 255 Neb. at 246, 583 N.W.2d at 335. Although we cited the Tylle definition in Maloley, we noted in Jorgensen that we had relied upon a pre-Tylle case in Maloley to determine once again that retirement planners were professionals. Because Mammel and Maloley did not analyze whether retirement planners were professionals under the Tylle definition, we determined that they were not dispositive of the issue in Jorgensen.
The two "retirement planners" in Jorgensen were employees of a bank that was the custodian of plaintiff's individual retirement account (IRA). The employees allegedly rendered advice to plaintiff concerning the IRA that resulted in the disqualification of plaintiff's IRA by the Internal Revenue Service. One employee had held a securities dealer license, but relinquished it when he went to work at the bank. He had attended 2 years of college as well as seminars dealing with IRA's. However, he had only limited experience in the investment area prior to working at the bank. The other employee had attended a school of commerce for 1 year and had also attended seminars, but testified that the bank did not require her to attend them on a yearly basis, nor had she attended such seminars annually.
In holding that the retirement planners in Jorgensen were not "professionals" within the meaning of § 25-222, we noted that neither had any specialized knowledge requiring long and intensive preparation to practice one's chosen occupation traditionally associated only with professionals. We stated that for purposes of the definition in Tylle v. Zoucha, 226 Neb. 476, 412 N.W.2d 438 (1987), "a college degree embodies such characteristics and that licensing, although not dispositive, *551 strongly indicates that an occupation is a profession." Jorgensen v. State Nat. Bank & Trust, 255 Neb. 241, 246, 583 N.W.2d 331, 335 (1998). The bank employees were expected to do nothing more than fill out forms, did not hold licenses, did not regularly supplement their educations, and were not subject to an ethical code enforced by a disciplinary system. Finally, we observed that there was no evidence indicating that the kind of work performed by the bank employees had for its primary purpose the rendering of a public service. Id.
The facts of this case are distinguishable from the facts in Jorgensen because Kenton was licensed as a general securities agent and had received training from his employers in providing services for clients. However, this is true of many licensed occupations. Nebraska has over 100 certified or licensed occupations. See Nebraska Workforce Dev., Dept. of Labor, Certified and Licensed Occupations in Nebraska (2004). Most require the applicant to pass a licensing examination. See, e.g., Neb.Rev.Stat. § 71-101 et seq. (Reissue 2003) (governing licenses under control of Department of Health and Human Services); Neb.Rev.Stat. § 81-885.13 (Reissue 2003) (requisite for real estate license).
In the interest of protecting the public, the Legislature has authorized regulating boards for many occupations with powers to uphold licensing standards. See, e.g., Neb.Rev.Stat. § 71-373 (Reissue 2003) (creating Board of Cosmetology Examiners to protect health and safety of citizens); Neb.Rev.Stat. § 81-2104 (Supp.2003) (authorizing State Electrical Board to regulate licensure); Neb.Rev.Stat. § 81-3402 (Reissue 1999) (in interest of public welfare, requiring architects and professional engineers to obtain board-issued license). These boards or the controlling government agency may generally suspend or revoke licenses for specified conduct or criminal convictions. The grounds, however, for disciplinary action against persons holding a business license generally do not act to maintain a high standard of conduct equivalent to the ethical duties of professionals. See, Neb.Rev.Stat. § 8-1103(9)(a) (Supp.2003) (stating grounds for denying, suspending, or revoking securities license); Neb.Rev.Stat. § 76-551 (Reissue 2003) (authorizing disciplinary actions against licensed abstractors for specified conduct or felony convictions); Neb.Rev.Stat. § 81-885.24 (Reissue 2003) (specifying conduct constituting unfair trade practices or fraud for persons holding real estate license). Compare Code of Professional Responsibility (setting out canons of ethical considerations for attorneys).
Further, the educational requisites for licensure vary widely and include the following: (1) no postsecondary education requirement or a requirement of previous work experience, see, e.g., Neb.Rev.Stat. § 76-542 (Reissue 2003) (requisites for abstractor); (2) a requirement of specified hours of postsecondary education and/or experience, see, e.g., Neb.Rev.Stat. § 81-8,117 (Reissue 2003) (requisites for land surveyor); (3) a requirement that the applicant complete coursework in an industry school or training program, see, e.g., Neb.Rev.Stat. § 71-387 (Reissue 2003) (requisites for cosmetology license); (4) a requirement of a 4-year degree from an accredited college or university, see, e.g., § 71-1,241 (requisites for athletic trainer); (5) a requirement of a postgraduate degree from a professional school or program, see, e.g., § 71-1,104 (requisites for license to practice medicine and surgery). The real estate broker in Tylle v. Zoucha, 226 Neb. 476, 412 N.W.2d 438 (1987), was required to complete approved postsecondary coursework and pass a licensing examination *552 before obtaining his license. See § 81-885.13(3) (requiring combination of experience and education or more extensive postsecondary education in addition to passing licensing examination for real estate brokers). The State Real Estate Commission was authorized to investigate and discipline license holders for unfair trade practices. See § 81-885.24. We nonetheless determined in Tylle that a real estate license did not transform a licensed occupation into a licensed profession for purposes of § 25-222.
Our decision in Tylle is in accord with the emphasis we have placed on college degrees in Jorgensen v. State Nat. Bank & Trust, 255 Neb. 241, 583 N.W.2d 331 (1998), and Georgetowne Ltd. Part. v. Geotechnical Servs., 230 Neb. 22, 430 N.W.2d 34 (1988). See, also, Motor Club Ins. Assn. v. Fillman, 5 Neb.App. 931, 568 N.W.2d 259 (1997) (doubting that insurance agents were professionals under Tylle definition, but declining to reach issue when claim was barred); Garden v. Frier, 602 So.2d 1273, 1275 (Fla.1992) (in absence of legislative guidance, defining profession as "any vocation requiring at a minimum a four-year college degree before licensing is possible"); Chase Scientific Research v. NIA Group, 96 N.Y.2d 20, 749 N.E.2d 161, 725 N.Y.S.2d 592 (2001) (noting lack of legislative definition of professional under nonmedical malpractice statute of limitations and concluding that insurance agents and brokers were not professionals whose qualities include extensive formal learning and training).
In contrast to those occupations that are commonly recognized as professions, agents of broker-dealers in securities are not required to obtain a degree as a prerequisite to taking a licensing examination. See 48 Neb. Admin. Code, ch. 6 (2001). Kenton did not testify to having obtained any securities license requiring advanced education or significant experience in his field. We do not doubt that the general securities representative examination requires preparation. However, neither the evidence at trial nor the securities regulations indicate that obtaining the license for Kenton's occupation required long and intensive training or preparation on a par with a college degree, or even preparation equivalent to that required for a real estate broker license  an occupation that we have determined is not a profession. See Tylle v. Zoucha, supra. For these reasons, we conclude that Kenton was not a professional.
We do not consider Merrill Lynch's alternative arguments that even if the professional negligence statute of limitations does not bar Parks' claim, the claim is barred by the statute of limitations claims under § 25-207 (ordinary negligence) and § 25-206 (breach of oral contract). We determine that Merrill Lynch's alternative arguments were not properly preserved for review because they were not set forth as grounds in Merrill Lynch's motion for directed verdict following the close of Parks' case and in Merrill Lynch's renewed motion for directed verdict at the close of evidence.
Section 25-1315.02 governs the procedure applicable to motions for judgment notwithstanding the verdict. It provides, in relevant part: "If a verdict is not returned, within ten days after the jury is discharged a party who has moved for a directed verdict may move for judgment in accordance with the moving party's motion for a directed verdict." (Emphasis supplied.) The plain language of § 25-1315.02 dictates that where a jury is unable to return a verdict and is discharged, a party must have previously asserted its stated grounds for judgment notwithstanding the verdict in its motion for directed verdict. Otherwise, the trial court may *553 not properly sustain the motion for judgment notwithstanding the verdict, and the asserted grounds are not properly preserved for appeal. See, Spulak v. Tower Ins. Co., 251 Neb. 784, 559 N.W.2d 197 (1997) (motion for judgment notwithstanding verdict may not properly be sustained in absence of motion for directed verdict made at close of all evidence); Ditloff v. Otto, 239 Neb. 377, 476 N.W.2d 675 (1991) (specifying that when jury is discharged for its inability to reach verdict, § 25-1315.02 authorizes motion for judgment notwithstanding the verdict in accordance with denied motion for directed verdict made at close of all evidence); In re Estate of Fehrenkamp, 154 Neb. 488, 48 N.W.2d 421 (1951) (determining that trial court's order overruling motion for judgment notwithstanding verdict determines right of proponent to directed verdict; concluding, therefore, that merits of motion for directed verdict were properly considered on appeal).
In support of its motion for judgment notwithstanding the verdict, Merrill Lynch raised the statute of limitations issues under §§ 25-206 and 25-207. However, it failed to raise these issues in its motion for directed verdict following the close of Parks' case and in its renewed motion for directed verdict at the close of evidence. Accordingly, Merrill Lynch did not preserve its remaining assignments of error for appellate review.

CONCLUSION
Based on the facts as presented to the trial court, we conclude that Kenton is not a professional. Merrill Lynch did not properly preserve its remaining assignments of error, and, as such, we do not address them.
AFFIRMED.
HENDRY, C.J., and STEPHAN and MILLER-LERMAN, JJ., not participating.