JOHN GILLOTTE, APPELLEE, v. OMAHA PUBLIC POWER DISTRICT, A CORPORATION, APPELLANT, IMPLEADED WITH LARSON CEMENT STONE CO., A CORPORATION, APPELLEE.
176 N. W. 2d 24

Filed March 13, 1970. No. 37282.

Fraser, Stryker, Marshall & Veach, for appellant.

Matthews, Kelley, Cannon & Carpenter, for appellee Gillotte.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

McCOWN, J.

This is an action for damages for bodily injuries resulting from electrical shock and burns. The injuries occurred while plaintiff, John Gillotte, was unloading a boom truck alongside an electric power line constructed and maintained by the defendant, Omaha Public Power District. The verdict of the jury was for the plaintiff in the sum of $79,263. The defendant has appealed from the overruling of a motion for judgment notwithstanding the verdict.

On August 25, 1967, at around 9 a.m., the plaintiff, John Gillotte, an employee of Larson Cement Stone Company was delivering concrete blocks and building supplies to a house under construction at 13215 Cedar Street, Omaha, Nebraska. The house was on a triangular shaped lot. The south and rear lot line was the base of the triangle and ran east and west. The south side of the house ran parallel to and approximately 34 feet north of the rear lot line.

The defendant's single-pole power line also ran east and west, substantially on the rear lot line. The specifications for the power line called for 35 foot poles set 5½ feet in the ground. The span between the poles at the construction site was 172 feet. The center of this span was almost directly south of the southeast corner of the house under construction.

The single primary 8,000 volt line was aluminum, approximately ¼ inch in diameter. It was carried on insulators extending some 6 to 8 inches above the top of the poles. Approximately 5 feet below the 8,000 volt line on the east pole, and 9 feet below the primary line on the west pole, a ground or neutral wire was mounted. Immediately below this ground wire were two secondary lines carrying 120 and 240 volts respectively. The two lower wires were insulated. The ground wire and the primary 8,000 volt line on top were uninsulated.

The day was clear and the wind was from the south. It was fairly strong and gusty according to plaintiff's witnesses. The weather bureau record showed the average velocity of the wind that day was 9.2 miles per hour, with the fastest mile 13 miles per hour.

Due to trucks and other obstructions, plaintiff was unable to drive his truck in from the street to the north. He drove around and backed his boom truck across a vacant lot to the south of the house under construction, under the defendant's power line, and up near the house. He parked his truck facing at an angle to the southwest, and slightly downhill. The right rear of plaintiff's boom truck was close to the southeast corner of the house. The left front corner of the boom truck was closest to the power line. Before unloading, the plaintiff testified that he checked to make sure that the front of his truck completely cleared any of the power lines and testified that he had about 4 to 5 feet clearance. He did not see any motion in the wires when he looked.

The boom truck itself had an overall length of 27 feet and a width of 7 feet 11 inches. The boom was

a nontelescoping boom mounted on a pivot post or tower located in the center and 4 feet 10 inches forward from the rear of the truck bed. The boom was 21 feet 4 inches long. When stored horizontally in its cradle centered over the cab of the truck, the top edge of the boom was 7 feet above the truck bed, and the truck bed was 4 feet 4 inches above the ground. The boom was operated by a control box attached to a 12 foot cable at the rear of the truck.

After positioning his truck, the plaintiff set his brakes, removed the control box from the rear of the truck, raised the boom, and observed that he had 5 feet clearance between the boom and the closest point of the wires. The plaintiff then proceeded to unload three pallets or cubes of construction materials using the boom for each one. Two loads were unloaded from the west side of the truck with the boom, and a third load was unloaded from the east side of the truck to the rear. The plaintiff then brought the boom back to approximately the same position it had been in, in preparing to unload the third load. The boom was extended over the left rear corner of the cab of the truck. The plaintiff was holding the control box and was standing on the ground toward the rear of the truck and on the east side. In the process of preparing to unload the fourth load, the plaintiff was knocked down by an electric shock that came through the control cable and the control box in his hands. Plaintiff fell unconscious with the control box on his chest. The first shock also stopped the truck engine which operated the hydraulic system and the boom. After a second shock, the mason who was assisting the plaintiff in unloading, grabbed the control cable, pulled the control box off plaintiff's chest, and threw the box to the ground. The mason received no electric shock. The truck began to roll to the southwest and moved approximately 2 feet forward before the mason and his helper could place concrete blocks in front of the wheels and stop it. Plaintiff's witnesses testified that the 8,000

volt electric line was swinging back and forth at least 2 or 3 feet to each side and contacting the end of the boom each time it swung north. After contacting the end of the boom some 10 or 12 times, the wire broke and fell to the ground. The evidence is undisputed that electric current of 8,000 volts will arc or jump approximately a 1-inch gap.

Shortly after the accident, a burn mark on the end of the boom was measured and found to be 20 feet above the ground. A new line of the same aluminum conductor was installed in this span the same day. The initial stringing sag placed in the new line was 22 inches, which was the proper initial sag for this 172 foot span. With that 22 inch sag in it, the new line was 23 feet 6 inches above the ground at the point of the accident. At the same temperature, final sag would be approximately 6 inches lower. There was no testimony as to the height or the amount of sag or clearance for any of the three wires below the 8,000 volt line on the poles. None of these three wires were damaged or disturbed. The evidence is convincing that the actual sag in the 8,000 volt line immediately before the accident was at least 5 feet. There was also evidence from which the jury might infer that this span was initially constructed with a general elevation 4½ feet lower than the engineering specifications indicated.

The National Electrical Safety Code specified a minimum clearance of 15 feet above ground for all supply wires carrying from 0 to 15,000 volts, where the ground spaces crossed were accessible only to pedestrians.

The electric line involved here was installed in November 1964. It had been inspected once since that date on June 1, 1966, and no defects were reported. There was evidence that one of the reasons for inspection is to guard against excessive sag and that excessive sag was not in conformity with engineering design nor common good practice. There was also evidence that excessive sag permits excessive swing and lateral motion,

and that it is dangerous to have any excess lateral moveability of uninsulated electric transmission wires.

The conduct of the defendant in three particular respects was alleged to be negligent: (1) In maintaining an uninsulated power line closer to the ground than suggested by safety regulations and requirements of due care; (2) in maintaining a power line with a sag in excess of that suggested by safety regulations and the exercise of due care; and (3) in failing to make reasonable inspections of its electric wires. These specifications of negligence were submitted to the jury and the jury was instructed that the plaintiff must prove the defendant negligent in one or more of those particulars, and that such negligence was the proximate cause of the accident and injuries. The defendant raises no issue as to the instructions.

Electricity is a dangerous thing and power companies engaged in the transmission of electricity, particularly electricity of high voltage, are charged with the duty of exercising a very high degree of care to safeguard those whose lawful activity exposes them to the risk of inadvertent contact with the electric lines. Electric companies are not insurers and are not liable for injuries in the absence of negligence. See Roos v. Consumers Public Power Dist., 171 Neb. 563, 106 N. W. 2d 871. See, also, Manaia v. Potomac Electric Power Co., 268 F. 2d 793.

The principal basis for determining liability of a power company for injuries resulting from contact between its wires and a moveable machine is the foreseeability of a situation arising which might lead to such injuries. Where the circumstances are such that the probability of danger to persons having a right to be near an electric line is reasonably foreseeable, power companies have often been held liable for injury or death resulting from contact between the power line and a moveable machine, such as the one involved here. See Annotation, "Liability of electric power company for injury or death resulting from contact of crane, der-

rick, or other movable machine with electric line." 69 A. L. R. 2d 93, §§ 4 and 5, p. 104.

As this court stated in Roos v. Consumers Public Power Dist., *supra:* "Such companies, being engaged in the transmission of a dangerous commodity, must anticipate and guard against events which may reasonably be expected to occur, and a failure to do so is negligence." In this case, the defendant's power line was constructed and maintained for almost 3 years in a developing residential neighborhood in which houses were under construction and the use of equipment such as the plaintiff was operating in the area adjacent to the electric line might reasonably be expected.

It suffices to charge a person with liability for a negligent act if some injury to another ought reasonably to have been foreseen as the probable result thereof by the ordinarily intelligent and prudent person under the same circumstances, even though the specific injury might not be foreseeable. McClelland v. Interstate Transit Lines, 142 Neb. 439, 6 N. W. 2d 384.

If the facts are such that reasonable men may draw different inferences from them, the question of the existence of actionable negligence is ordinarily for the jury. This principle of the law of negligence has frequently been applied in cases presenting factual situations similar to this one. See, 69 A. L. R. 2d 99, and cases there cited; 38 Am. Jur., Negligence, § 344, p. 1041.

Here differing conclusions might be drawn from the evidence. The jury could have found that excessive sag was present in this line from the time of its construction, and that such excessive sag was dangerous to persons having a right to be near the line because the breeze blown swing of the wires was widened beyond normal expectations. The factor of excessive sag was indirectly recognized as being relevant evidence of negligence in Disney v. Butler County Rural Public Power Dist.; 183 Neb. 420, 160 N. W. 2d 757.

The jury might also have found from the evidence

that the line was constructed and maintained at an elevation lower than defendant's own specifications called for, and that the defects in the line were open and obvious at all times after its construction but were not discovered nor corrected by the defendant.

The major conflict in the evidence here goes directly to the issue of proximate cause. The testimony of plaintiff's witnesses was that the 8,000 volt electric line swung 2 to 3 feet laterally in the wind and contacted the motionless boom intermittently until the line broke. The testimony of defendant's witnesses indicated either that the line did not swing at all or that the plaintiff placed the boom in contact with the wire.

In determining the sufficiency of evidence to sustain a judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor and he is entitled to every inference that can be reasonably deduced from the evidence. Lucht v. American Propane Gas Co., 183 Neb. 583, 162 N. W. 2d 891.

On that principle, it is apparent that if the conduct of the defendant was negligent, the defendant's negligence proximately caused the injuries to the plaintiff. Cases in which there was no negligence in maintenance of an electric line or cases involving the independent or intervening negligence of third parties are not in point.

The issue of plaintiff's contributory negligence likewise involved issues of fact and was duly submitted to the jury with instructions which are unchallenged.

The motion for judgment notwithstanding the verdict was properly overruled. The judgment of the trial court was correct and is affirmed.

AFFIRMED.