JUDITH A. HUGHES, IN HER OWN RIGHT, AND JUDITH A. HUGHES, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF NICKOLAS J. HUGHES, DECEASED, APPELLANT, V. OMAHA PUBLIC POWER DISTRICT, A NEBRASKA POLITICAL SUBDIVISION, ET AL., APPELLEES.

JUDITH A. HUGHES, IN HER OWN RIGHT, AND JUDITH A. HUGHES, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF NICKOLAS J. HUGHES, DECEASED, APPELLANT, V. NEBRASKA COMMUNICATIONS, INC., A NEBRASKA CORPORATION, AND RADIODETECTION CORPORATION, A NEW JERSEY CORPORATION, APPELLEES.

735 N.W.2d 793

Filed July 27, 2007. Nos. S-05-1223, S-06-216.

Raymond E. Baker, of Law Offices of Raymond E. Baker, P.C., and Michael W. Heavey, of Colombo & Heavey, P.C., for appellant.

Rex A. Rezac and Russell A. Westerhold, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellee Omaha Public Power District.

Daniel P. Chesire, of Lamson, Dugan & Murray, L.L.P., and Raymond E. Walden, of Walden Law Office, for appellee Radiodetection Corporation.

Stephen S. Gealy and Amanda A. Dutton, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee Nebraska Communications, Inc.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Nickolas J. Hughes suffered fatal injuries when he came into contact with an underground electrical line owned by Omaha Public Power District (OPPD) while working in an excavation. Judith A. Hughes, his widow and the personal representative of his estate, brought this personal injury and wrongful death action against OPPD; Nebraska Communications, Inc. (NebCom); and Radiodetection Corporation (RDC). The district court granted OPPD's motion for summary judgment, concluding that it owed no legal duty to Hughes. Subsequently, in a separate order, the court entered summary judgment in favor of NebCom and RDC, determining as a matter of law that by his actions, Hughes had assumed the risk of injury. The personal representative perfected timely appeals from both orders, and we consolidated the appeals. We conclude that the record supports the judgment entered by the district court in favor of OPPD but does not support the judgment in favor of NebCom and RDC.

## I. BACKGROUND

### 1. OMAHA PUBLIC POWER DISTRICT

OPPD is a publicly owned utility company providing electrical power to Omaha, Nebraska, and portions of southeastern Nebraska. It is a political subdivision of the State.[1]

#### (a) Underground Electrical Powerline

OPPD maintains a buried, 8,000-volt, three-phase powerline in a public utility easement along portions of the east side of 120th Street in Omaha. The installation consists of three individual phase cables and one neutral cable, each housed in unmarked PVC conduit approximately 3 inches in diameter.

---

[1] See Neb. Rev. Stat. § 13-903(1) (Cum. Supp. 2006).

The conduits are buried 3 to 4 feet below the surface of the ground. The relevant portions of the powerline along 120th Street were installed in 1980 and 1985.

At the time the powerlines were installed, OPPD had an internal reference drawing which provided design specifications on buried cable trenches. That standard provided that when specified by an OPPD design engineer, a warning or identifying tape may be buried 1 foot below the surface of the ground directly above the buried powerlines. The tape was described as a "thin piece of plastic with some type of verbiage" indicating the presence of a buried cable below. Testimony indicated that the decision on whether to specify the identifying tape is discretionary with OPPD design engineers. When asked the circumstances in which such specification would be made, an OPPD representative testified:

> This particular cable was located in public right away [sic]. The people digging in those types of facilities are, generally, contractors and people in the business. If we were to go across private property, like, the homeowners', we never called in to get a locate. The engineer would have probably specified it or might have specified if he thought it was necessary.

A buried-cable industry standard also existed at the time the powerlines were installed. The relevant standards for the buried powerlines in question were the 1977 and 1984 editions of the American National Standards Institute's National Electrical Safety Code. Both standards specified, among other things, the minimum horizontal clearances between cables and minimum burial depth. However, neither standard required that the conduit or sheathing contain warning markings, nor did either require that warning or identifying tape be buried with the cable.

### (b) One-Call Notification System Act

In 1994, the Legislature enacted the One-Call Notification System Act, Neb. Rev. Stat. §§ 76-2301 to 76-2330 (Reissue 1996).[2] As the owner of buried electrical utilities, OPPD is an

---

[2] See 1994 Neb. Laws, L.B. 421.

operator for purposes of the act.[3] At all relevant times to this action, Diggers Hotline of Nebraska operated the statewide call center providing the buried utility notification services required by the act.[4] In 2001, the act provided:

(1) A person shall not commence any excavation without first giving notice to every operator. An excavator's notice to the center shall be deemed notice to all operators. An excavator's notice to operators shall be ineffective for purposes of this subsection unless given to the center. Notice to the center shall be given at least two full business days, but no more than ten business days, before commencing the excavation . . . . An excavator may commence work before the elapse of two full business days when (a) notice to the center has been given as provided by this subsection and (b) all the affected operators have notified the excavator that the location of all the affected operator's underground facilities have been marked or that the operators have no underground facilities in the location of the proposed excavation.

(2) The notice required pursuant to subsection (1) of this section shall include (a) the name and telephone number of the person making the notification, (b) the name, address, and telephone number of the excavator, (c) the location of the area of the proposed excavation . . . (d) the date and time excavation is scheduled to commence, (e) the depth of excavation, (f) the type and extent of excavation being planned . . . and (g) whether the use of explosives is anticipated.[5]

The act requires that operators receiving notice from the center of a planned excavation "shall advise the excavator of the approximate location of underground facilities in the area of the proposed excavation by marking or identifying the location of the underground facilities with stakes, flags, paint, or

---

[3] See § 76-2313.

[4] See §§ 76-2305 and 76-2318.

[5] § 76-2321.

any other clearly identifiable marking or reference point."[6] The act further specifies that marking or identification of underground facilities

> shall be done in a manner that will last for a minimum of five business days on any nonpermanent surface and a minimum of ten business days on any permanent surface. If the excavation will continue for longer than five business days, the operator shall remark or reidentify the location of the underground facility upon the request of the excavator. The request for remarking or reidentification shall be made through the center.[7]

The act imposes strict liability for property damage on excavators who fail to give notice of an excavation and subsequently damage underground facilities.[8] The act further imposes civil penalties on operators and excavators who violate the notification and marking provisions of the act.[9]

### 2. RADIODETECTION CORPORATION

RDC is a New Jersey corporation which manufactures equipment used to locate underground utilities. One of its products is the "GatorCam System," which includes, among other things, a "Gator Locator," and a "Gator Transmitter." The system can be used in different modes of operation, depending on the type of buried utility that is sought to be located.

### 3. NEBRASKA COMMUNICATIONS

NebCom is a telecommunications contractor located in Sarpy County, Nebraska. It acts as a general contractor for telecommunications companies requiring installation and maintenance projects. In 2001, NebCom served as a general contractor for Qwest Communications, formerly known as U S West Communications.

.

---

[6] § 76-2323(1).

[7] § 76-2323(2).

[8] See § 76-2324.

[9] See § 76-2325.

On June 14, 2001, Qwest Communications engaged NebCom to clean out an empty PVC conduit buried in the utility easement along the east side of 120th Street in Omaha, south of Miracle Hills Drive. NebCom subcontracted the work to Burton Plumbing Services, Inc. (Burton), a plumbing contractor located in Omaha. NebCom did not notify Diggers Hotline at any time relevant to the project.

### 4. NICKOLAS HUGHES

Hughes was employed by Burton as a lead drain technician. He had been employed by Burton since about 2000 and was supervised by Bruce Arp and, on specific projects, by Patrick Morse. Arp testified that Hughes had been instructed on how to use the GatorCam system. Other testimony established that Burton employees attended periodic safety training and had generally been instructed that they were not to cut into any object unless the employee was absolutely sure of what it was. One employee testified that he was not specifically instructed on this point by Burton but that he knew from experience and common sense not to cut a line without knowing what it was.

### 5. HUGHES' ACCIDENT

Sometime between June 14 and June 22, 2001, Hughes and Steven Sinnett, another Burton employee, began the work of cleaning the buried conduit along 120th Street. They used a specialized commercial pressure washer called a jetter which they inserted into the empty conduit from a manhole access point located on the east side of 120th Street south of Miracle Hills Drive. They extended the jetter through the conduit to the next manhole access point to the north, a distance of about 400 to 500 feet. When the jetter had been completely fed through the conduit, they connected a separate cable to the jetter head and attempted to pull the jetter and cable back through the conduit. During this process, the jetter became stuck. Burton employees used various methods to attempt to dislodge the jetter from the conduit, but were unsuccessful. At some point, Burton informed NebCom of the situation. The NebCom maintenance supervisor testified that she offered to hire an excavation contractor to retrieve the jetter for Burton, but Hughes declined that offer, indicating that Burton was capable of such excavation project.

On or about June 27, 2001, Burton employees Danny Anderson and Richard Griffen were sent to excavate in the area of the stuck jetter. They were under the supervision of Morse. Based on the estimated amount of jetter hose which had been fed into the conduit, they began digging a hole about 300 feet south of Miracle Hills Drive. The evidence reflects that no one from Burton called Diggers Hotline before commencing this excavation. However, Anderson, Griffen, and Morse testified that they saw paint markings along the sidewalk indicating the existence of buried utilities. The record indicates that another excavating contractor had previously called Diggers Hotline regarding excavation work on the east side of 120th Street, south of Miracle Hills Drive, which was unrelated to this action. Because they were aware from markings on the ground that other buried utilities, including electrical lines, were in the area, Anderson and Griffen used shovels and a probe rod, instead of a backhoe, to excavate. Griffen testified: "We hand-excavated all the utilities because there were so many utilities right in that area there is no way that you could safely get a piece of equipment in there to excavate it. So we hand-dug everything." In this manner, they exposed four conduits. Anderson testified that his instructions were not to touch anything, but to "just dig it up, expose it, and leave it."

Morse testified that he and Hughes discussed the situation at the 120th Street jobsite at Burton's shop on June 27, 2001. Morse informed Hughes that he intended to place a request through Diggers Hotline to have the utility companies, including OPPD, come to the site to identify the exposed conduits. Morse testified that he mentioned the risk of electrocution and told Hughes not to cut any of the conduits until they were identified. Morse also testified that on the following morning, while working with Hughes at another jobsite, he again told him not to cut any of the exposed conduits at the 120th Street site until they were identified. Morse told Hughes that he had to go to another site, but that he would meet him at the 120th Street site and that Hughes should not do anything until Morse arrived there.

On the morning of June 28, 2001, Sinnett arrived at the 120th Street site and attempted to use an RDC GatorCam system

owned by Burton to verify that the stuck jetter was located in the excavated area. Sinnett pushed a metal "fish tape" into the conduit as far as it would go, thereby reaching the location at which he assumed the jetter was stuck. He then connected one Gator transmitter lead to the fish tape and the other lead to a grounding rod. Using the Gator locator, Sinnett was able to detect a signal emanating from the fish tape. The signal was not detected by the Gator locator beyond the excavated hole. Sinnett concluded that the jetter was located in one of the exposed conduits in the excavation.

Hughes arrived at the excavation scene later that morning. He used the Gator locator in the same manner as had Sinnett. Standing in the excavation, Hughes then used a multipurpose handtool to tap on each of the four exposed conduits. Sinnett heard Hughes say that one of the conduits sounded hollow, and then Sinnett observed as Hughes began cutting it with the handtool. Another eyewitness, Burton employee Paul Barrett, testified that immediately before cutting the conduit, Hughes joked about the possibility that it might be a sprinkler line and that he could be sprayed with water. Sinnett, Barrett, and Anderson, who was also present at the jobsite, testified that shortly after Hughes began cutting into the conduit, a ball of fire erupted from the excavated hole. After the fire subsided, the three pulled Hughes from the excavation. Hughes suffered severe burn injuries from which he died on the following day.

### 6. Procedural History

#### (a) Pleadings

On June 25, 2003, the personal representative filed this action in the district court for Douglas County against OPPD, NebCom, and RDC, seeking damages for Hughes' injuries and death. In her complaint, she alleged, restated, that OPPD was negligent in (1) failing to warn of the presence of the buried electrical transmission line, (2) failing to conspicuously mark the buried lines with warnings, and (3) burying the lines directly adjacent to other utility conduits. She further alleged, restated, that NebCom was negligent in (1) failing to provide precautions regarding the safe conduct of the work, (2) failing to provide a safe workplace, (3) placing its utility conduit directly

adjacent to electrical powerlines, (4) failing to exercise its right to control the safety and supervise the work of Hughes, and (5) failing to provide adequate training and/or equipment to Burton employees. The personal representative also alleged negligence and strict liability claims against RDC.

OPPD answered, denying its negligence and raising several affirmative defenses, including assumption of risk. In their answers, NebCom and RDC also pled assumption of the risk as an affirmative defense.

### (b) Summary Judgment as to OPPD:
### Case No. S-05-1223

All three defendants subsequently moved for summary judgment. After conducting a hearing at which evidence was offered in support of and in opposition to the motions, the district court sustained OPPD's motion for summary judgment but denied those of NebCom and RDC. The district court reasoned that because OPPD did not have notice of the excavation in the area of its buried powerlines as required under the One-Call Notification System Act, it did not owe a duty to warn Hughes of such lines. The court also determined that the personal representative did not present expert testimony on the issue of standard of care. In the same order, the district court denied the motions for summary judgment filed by NebCom and RDC, determining that there were genuine issues of material fact with respect to some claims and defenses, including assumption of risk. Pursuant to Neb. Rev. Stat. § 25-1315(1) (Cum. Supp. 2004), the district court directed that the judgment in favor of OPPD was final. From that order, the personal representative perfected a timely appeal, which we moved to our docket on our own motion.[10] That appeal is docketed as case No. S-05-1223.

### (c) Summary Judgment as to NebCom and RDC:
### Case No. S-06-216

After conducting additional discovery, NebCom and RDC again moved for summary judgment. Following a hearing at

---

[10] See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

which additional evidence was received, the district court sustained both motions, determining as a matter of law that the personal representative's claims were barred by the assumption of risk defenses asserted by NebCom and RDC. The court determined that Hughes knew of and understood the specific risk posed to him by the powerline, that Hughes voluntarily exposed himself to the danger, and that Hughes' death occurred as a result of his exposure to the danger. After the district court directed entry of a final judgment pursuant to § 25-1315(1), the personal representative timely appealed. We granted the petitions of the personal representative and NebCom to bypass the Nebraska Court of Appeals and consolidated this appeal with the appeal involving OPPD.[11] The appeal from the order dismissing the action as to NebCom and RDC is before us as case No. S-06-216.

## II. ASSIGNMENTS OF ERROR

In the action against OPPD, the personal representative assigns, restated and consolidated, that the district court erred in finding that (1) OPPD did not owe a duty to warn Hughes and (2) she failed to carry her burden of proof by failing to provide expert testimony.

In the action against NebCom and RDC, the personal representative assigns, restated and consolidated, that the district court erred in finding that Hughes knew and appreciated the danger that existed.

## III. STANDARD OF REVIEW

Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[12] In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted

---

[11] See § 24-1106(2).

[12] *City of Lincoln v. Hershberger*, 272 Neb. 839, 725 N.W.2d 787 (2007).

and gives such party the benefit of all reasonable inferences deducible from the evidence.[13]

■ When reviewing questions of law, an appellate court resolves the questions of law independently of the trial court's conclusions.[14]

## IV. ANALYSIS

### 1. CASE NO. S-05-1223: SUMMARY JUDGMENT IN FAVOR OF OPPD

■ The personal representative alleged that OPPD was negligent in failing to warn of the existence and location of its underground powerline. The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff.[15] If there is no legal duty, there is no actionable negligence.[16] The question of what duty is owed and the scope of that duty is multifaceted.[17] First, and foremost, the question of whether a duty exists at all is a question of law.[18]

#### (a) Statutory Duty

At the time of the accident, OPPD had certain duties under the One-Call Notification System Act. The act was intended "to establish a means by which excavators may notify operators of underground facilities in an excavation area so that operators have the opportunity to identify and locate the underground facilities prior to excavation."[19] The purpose of the act was "to aid the public by preventing injury to persons and damage to property and the interruption of utility services resulting from

---

[13] *Id.*

[14] *City of Elkhorn v. City of Omaha*, 272 Neb. 867, 725 N.W.2d 792 (2007).

[15] *Washington v. Qwest Communications Corp.*, 270 Neb. 520, 704 N.W.2d 542 (2005); *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003).

[16] *Id.*

[17] *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001).

[18] *Id.*

[19] § 76-2302(1).

accidents caused by damage to underground facilities."[20] The term "underground facility" as used in the act includes buried electric lines.[21] As noted above, the duty is triggered by notice, transmitted through Diggers Hotline, that a person intends to excavate in a particular area.[22] The act requires that operators receiving notice from the center of a planned excavation "shall advise the excavator of the approximate location of underground facilities in the area of the proposed excavation by marking or identifying the location of the underground facilities with stakes, flags, paint, or any other clearly identifiable marking or reference point."[23] The act further specifies that marking or identification of underground facilities

> shall be done in a manner that will last for a minimum of five business days on any nonpermanent surface and a minimum of ten business days on any permanent surface. If the excavation will continue for longer than five business days, the operator shall remark or reidentify the location of the underground facility upon the request of the excavator. The request for remarking or reidentification shall be made through the center.[24]

There is no evidence that OPPD violated its statutory duty imposed by the One-Call Notification System Act. It is uncontroverted that no one from Burton notified Diggers Hotline before commencing the excavation. The record reflects that in response to notices transmitted to Diggers Hotline by other contractors in the weeks preceding the accident, OPPD marked its underground lines in the vicinity of 120th Street and Miracle Hills Drive. There is no evidence or claim that it did so in a manner contrary to the requirements of the act. There is no evidence that OPPD had actual or constructive knowledge that Burton employees had excavated and were working in the area in which the accident occurred.

---

[20] § 76-2302(2).

[21] § 76-2317.

[22] See § 76-2321.

[23] § 76-2323(1).

[24] § 76-2323(2).

### (b) Common-Law Duty

Our jurisprudence defining the duty of electric utilities to protect against electrocution is derived primarily from cases involving inadvertent contact with powerlines situated at or above ground level. In such cases, we have recognized that a power company engaged in the transmission of electricity is required to exercise reasonable care in the construction and maintenance of its lines.[25] The degree of care a power company must exercise varies with the circumstances, but it must be commensurate with the dangers involved, and where wires are designed to carry electricity of high voltage, the law imposes the duty to exercise the utmost care and prudence consistent with the practical operation of the power company's business to avoid injury to persons and property.[26] However, power companies are not insurers and are not liable for damages in the absence of negligence.[27]

Power companies must anticipate and guard against events which may reasonably be expected to occur, and the failure to do so is negligence.[28] Where circumstances are such that the probability of danger to persons having the right to be

---

[25] *Marshall v. Dawson Cty. Pub. Power Dist.*, 254 Neb. 578, 578 N.W.2d 428 (1998); *Engleman v. Nebraska Public Power Dist.*, 228 Neb. 788, 424 N.W.2d 596 (1988); *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987); *Roos v. Consumers Public Power Dist.*, 171 Neb. 563, 106 N.W.2d 871 (1961).

[26] *Engleman v. Nebraska Public Power Dist, supra* note 25; *Tiede v. Loup Power Dist., supra* note 25; *Roos v. Consumers Public Power Dist., supra* note 25.

[27] *Marshall v. Dawson Cty. Pub. Power Dist., supra* note 25; *Engleman v. Nebraska Public Power Dist., supra* note 25; *Tiede v. Loup Power Dist., supra* note 25; *Suarez v. Omaha P.P. Dist.*, 218 Neb. 4, 352 N.W.2d 157 (1984); *Lorence v. Omaha P. P. Dist.*, 191 Neb. 68, 214 N.W.2d 238 (1974); *Gillotte v. Omaha Public Power Dist.*, 185 Neb. 296, 176 N.W.2d 24 (1970); *Roos v. Consumers Public Power Dist., supra* note 25.

[28] *Engleman v. Nebraska Public Power Dist., supra* note 25; *Tiede v. Loup Power Dist., supra* note 25; *Suarez v. Omaha P.P. Dist., supra* note 27; *Lorence v. Omaha P. P. Dist., supra* note 27; *Gillotte v. Omaha Public Power Dist., supra* note 27; *Roos v. Consumers Public Power Dist., supra* note 25.

near an electrical line is reasonably foreseeable, power companies may be held liable for injury or death resulting from contact between the powerline and a movable machine.[29] A failure to anticipate and guard against a happening which would not have arisen except under exceptional or unusual circumstances is not negligence.[30]

In *Schmidt v. Omaha Pub. Power Dist.*,[31] we considered the claim of an excavator who was electrocuted when he struck an underground powerline with an auger while digging postholes on commercial property. Before digging, the excavator's employer called Nebraska Underground Hotline to have any buried utilities marked. The hotline passed the information on to utility companies, including OPPD. OPPD then marked the buried powerlines it owned on the property but did not mark any secondary powerlines it did not own. Neither OPPD nor the hotline warned the excavator or his employer of this fact. The excavator subsequently came into contact with an unmarked secondary powerline. This court reversed a summary judgment entered in favor of OPPD on procedural grounds without discussing whether OPPD had a duty to warn beyond marking the underground powerlines that it owned. In discussing whether the hotline owed a duty, we noted: "It is common knowledge that electricity is a dangerous commodity, and it requires little imagination to perceive the risk of electric shock to an individual who digs in an area containing hidden underground electric lines."[32]

 Based upon OPPD's reference drawing, the personal representative contends that OPPD had a duty to bury an identifying tape above the powerline to warn of its presence. In determining whether OPPD owed this duty to Hughes and others

---

[29] *Engleman v. Nebraska Public Power Dist., supra* note 25; *Tiede v. Loup Power Dist., supra* note 25; *Gillotte v. Omaha Public Power Dist., supra* note 27.

[30] *Roos v. Consumers Public Power Dist., supra* note 25.

[31] *Schmidt v. Omaha Pub. Power Dist.*, 245 Neb. 776, 515 N.W.2d 756 (1994).

[32] *Id.* at 786, 515 N.W.2d at 763.

similarly situated, we employ a risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution.[33]

### (i) Magnitude and Nature of Risk

Obviously, electricity is a dangerous commodity.[34] As noted, however, most of our cases involving the duty owed by electric utility companies involve powerlines placed above ground level. Underground powerlines present a somewhat different risk, which we identified in *Schmidt* as "the risk of electric shock to an individual who digs in an area containing hidden underground electric lines."[35] In this case, Hughes was not involved in the excavation which exposed the underground line. Burton employees who performed the excavation were aware of the existence of the buried powerlines from surface markings requested by other contractors. Using a probe and shovels, they carefully exposed the conduits. Once exposed, the powerline sheathed in its PVC conduit posed no risk unless intentionally or accidentally cut.

### (ii) Relationship of Parties

The record reflects no employment or contractual relationship between OPPD and Hughes or Burton. At the time of the accident, OPPD had not been given actual or constructive notice that Burton employees had exposed the underground powerline and were working in its vicinity.

### (iii) Opportunity and Ability to Exercise Care

The personal representative contends that OPPD had the opportunity to exercise care by simply implementing the internal design standards OPPD had in place at the time it originally

---

[33] See, *Fuhrman v. State, supra* note 15; *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000).

[34] See, *Schmidt v. Omaha Pub. Power Dist., supra* note 31; *Lorence v. Omaha P. P. Dist., supra* note 27; *Gillotte v. Omaha Public Power Dist., supra* note 27.

[35] *Schmidt v. Omaha Pub. Power Dist., supra* note 31, 245 Neb. at 786, 515 N.W.2d at 763.

installed the buried powerlines. Those internal standards indicate that OPPD will bury a warning or identifying tape about 1 foot below the surface of the ground directly above the power cables "when specified" by an OPPD design engineer. OPPD asserts that the decision whether to specify the identifying tape is discretionary with its engineers. Furthermore, OPPD argues that the One-Call Notification System Act eliminated the need for OPPD to use the identifying tape.

Clearly, OPPD design engineers could have specified the identifying tape, although there were no code or industry standards mandating its use. It is not clear, however, that identifying tape would have prevented the accident. At most, the presence of the tape would have warned excavators that they were about to encounter an underground powerline. The Burton employees who did the actual excavation knew this and for that reason, carefully exposed the conduits using handtools instead of power equipment. Because Hughes was not present during the excavation, we cannot say on this record that he would ever have been aware of the identifying tape even if it had been specified and used.

### (iv) Foreseeability of Harm

 In the context of whether a legal duty exists, foreseeability refers to

> " " "the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care." ' "[36]

As we noted in *Schmidt*, the risk of accidental harm to a person who excavates in the vicinity of underground electric lines without knowledge of their existence is certainly foreseeable. But that is not the risk at issue in this case. Here, the question is whether the "risk reasonably to be perceived" included

---

[36] *Knoll v. Board of Regents*, 258 Neb. 1, 7, 601 N.W.2d 757, 763 (1999) (quoting *Clohesy v. Food Circus Supermkts.*, 149 N.J. 496, 694 A.2d 1017 (1997)).

a contractor's employee intentionally cutting an excavated and exposed underground conduit located in a public right-of-way before it had been identified by a utility company, in violation of his employer's policies. The circumstances of Hughes' fatal injuries are certainly unusual, if not unique. We conclude that these circumstances were not reasonably foreseeable at the time OPPD installed the underground powerline.

### (v) Policy Interests

The personal representative argues that because of the dangerous character of electricity, the public has an interest in the prevention of accidents arising from contact with buried powerlines. This argument finds support in *Schmidt*, where we recognized that "[t]he public certainly has a vital interest in preventing accidents from electrical shock."[37] We note, however, that *Schmidt* involved events which occurred before the enactment of the One-Call Notification System Act in 1994, which furthers the policy of the State "to aid the public by preventing injury to persons . . . resulting from accidents caused by damage to underground facilities."[38] In articulating this policy, the Legislature placed the burden on excavators to give notice so that utilities could mark underground facilities before any excavation occurred.

### (vi) Conclusion

Upon consideration of the risk-utility factors in light of the facts of this case, we conclude that OPPD did not owe a common-law duty to Hughes. The powerline was situated in a public right-of-way where contractors would reasonably expect to find underground utilities. No statute or code required use of identifying tape at the time the powerline was installed. Most importantly, the circumstances of Hughes' accident do not fall within the "risk reasonably to be perceived" from underground powerlines, as articulated in *Schmidt*. The accident arose from exceptional and unusual circumstances. Because we conclude that OPPD did not owe a common-law duty to Hughes, we

---

[37] *Schmidt v. Omaha Pub. Power Dist., supra* note 31, 245 Neb. at 790, 515 N.W.2d at 765.

[38] § 76-2302(2).

need not address the issue of whether the One-Call Notification System Act abrogated any preexisting common-law duty. Nor is it necessary for us to address the district court's ruling with respect to the absence of expert testimony as to the standard of care. We affirm the district court's grant of summary judgment in favor of OPPD.

## 2. Case No. S-06-216: Summary Judgment in Favor of NebCom and RDC

■ The issue in this appeal is whether the district court erred in granting the motions for summary judgment of NebCom and RDC based upon the affirmative defense of assumption of risk. As currently codified, "assumption of risk" as an affirmative defense means that (1) the person knew of and understood the specific danger, (2) the person voluntarily exposed himself or herself to the danger, and (3) the person's injury or death or the harm to property occurred as a result of his or her exposure to the danger.[39] It is undisputed that Hughes acted intentionally and voluntarily in cutting into one of the exposed underground conduits and that his death was the result of that act. The issue we must decide is whether, as a matter of law, he acted with knowledge and understanding of the specific danger.

### (a) Identification of Specific Danger

The district court defined the specific danger as "cutting into a power line causing an explosion or electrocution." While this describes the mechanism by which the fatal injury occurred, we do not accept it as a description of the "specific danger" which confronted Hughes when he stepped into the excavation and observed the exposed conduits. Nor do we accept the personal representative's argument that Hughes could not have assumed the risk of injury unless he knew that the specific conduit which he intentionally cut contained electricity. The record supports a reasonable inference that Hughes believed he had identified the conduit which contained the jetter he was attempting to dislodge. The specific danger was that at least one of the exposed conduits in the excavation actually contained electrical

---

[39] Neb. Rev. Stat. § 25-21,185.12 (Reissue 1995); *Burke v. McKay*, 268 Neb. 14, 679 N.W.2d 418 (2004).

current sufficient to cause injury or death. The question, thus, is whether Hughes knew and appreciated this fact when he cut into the conduit in which he believed the jetter was lodged.

(b) Knowledge and Understanding of Specific Danger

 The doctrine of assumption of risk applies a subjective standard, geared to the individual plaintiff and his or her actual comprehension and appreciation of the nature of the danger he or she confronts.[40] This subjective standard involves an inquiry into what the particular plaintiff in fact sees, knows, understands, and appreciates.[41] The doctrine of assumption of risk applies to known dangers and not to those things from which, in possibility, danger may flow.[42] As a respected commentator has explained:

> "Knowledge of the risk is the watchword of assumption of risk." Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he has no knowledge. Moreover, he must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger he confronts. . . . If, because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it. His failure to exercise ordinary care to discover the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence.[43]

In applying this subjective standard, our cases recognize that a plaintiff's knowledge of a general danger inherent in

---

[40] *Burke v. McKay, supra* note 39; *Jay v. Moog Automotive,* 264 Neb. 875, 652 N.W.2d 872 (2002).

[41] See, *Dukat v. Leiserv, Inc.,* 255 Neb. 750, 587 N.W.2d 96 (1998); *Williamson v. Provident Group, Inc.,* 250 Neb. 553, 550 N.W.2d 338 (1996); Restatement (Second) of Torts § 496D comment *c.* (1965).

[42] *Pleiss v. Barnes,* 260 Neb. 770, 619 N.W.2d 825 (2000); *Vanek v. Prohaska,* 233 Neb. 848, 448 N.W.2d 573 (1989); *Hickman v. Parks Construction Co.,* 162 Neb. 461, 76 N.W.2d 403 (1956).

[43] W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 68 at 487 (5th ed. 1984).

a particular activity is not enough to establish assumption of risk. Rather, the plaintiff must have actual knowledge of the specific danger which caused the injury. For example, in *Pleiss v. Barnes*, we held that the jury should not have been instructed on assumption of risk in a case involving a person who fell from a ladder when it "'flipped, twisted and started to slide'" as he placed shingles on a roof.[44] We reasoned that the plaintiff's admission that he knew that ladders could "'get shaky and fall'" was simply an acknowledgment that he was aware of the general danger involved in using ladders, but did not constitute knowledge of the specific risk that the ladder from which he fell could perform as it did.[45] In *Burke v. McKay*,[46] an action involving a claim that a rodeo stock provider furnished an unusually dangerous bucking horse to a high school rodeo, we noted that the plaintiff rider's acknowledged familiarity with the general risks of injury inherent in rodeo competition could not form the basis of an assumption of risk defense. However, we concluded that the rider had actual knowledge of the specific danger posed by the horse because he had observed a previous incident in which a rider was injured when the same horse performed in the same unusual manner which caused his injury.

The issue in this case is not whether Hughes should have known that one or more of the exposed conduits contained electrical current, but whether he actually knew, understood, and appreciated this specific danger. There is no direct evidence in the form of an admission or other statement by Hughes prior to his death that he had such knowledge. However, knowledge in the context of assumption of risk involves a state of mind or mental process which may be proved by circumstantial evidence.[47] In concluding that Hughes knew and

---

[44] *Pleiss v. Barnes, supra* note 42, 260 Neb. at 771, 619 N.W.2d at 827.

[45] *Id.* at 775, 619 N.W.2d at 829.

[46] *Burke v. McKay, supra* note 39.

[47] See, *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991); *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 423 N.W.2d 115 (1988).

understood the danger, the district court relied primarily on evidence of red markings in the area of the excavation which indicated the presence of underground powerlines, as well as statements made to Hughes by Burton employees about the danger of cutting into unidentified lines.

As we have noted, neither Burton nor NebCom contacted Diggers Hotline to request identification of underground utilities prior to the accident. However, several witnesses testified that there were visible red markings on the ground in the immediate vicinity of the excavation, apparently remaining from previous construction work in the area, which indicated the presence of underground electrical utilities. Arp, Burton's field supervisor, testified that the company held safety meetings at which the significance of "color codes" used to mark underground utilities was discussed with employees. There is evidence that Burton instructed its employees, including Hughes, never to cut into an underground line which had not been identified. Morse, Burton's utility superintendent, testified that on the afternoon prior to the accident, he told Hughes that he intended to call Diggers Hotline to request identification of the exposed conduits and that Hughes was not to cut anything until this was done. Morse repeated these instructions to Hughes on the following morning before Hughes went to the worksite. Although he could not recall exactly what he said, Morse testified: "I'm sure we discussed not cutting into anything until we find out what the lines are. We don't want to get killed, more or less, probably said that." When then asked "[w]hat was said about what could have happened," Morse testified: "It would probably cost us a $100,000 a day until they get it fixed, or could be electrocuted or anything like that. I mean, you just don't break them, you don't cut into them, you don't do that."

This evidence supports an inference that Hughes was aware of the specific danger posed by one or more electrical lines in the excavation. But when considered with other evidence, a contrary inference that Hughes was only aware of the general dangers is also possible. Arp responded affirmatively when asked if Hughes "knew or had the ability to find out what the different color lines signified after the utilities had been marked." Under the subjective standard applicable to assumption of risk, it must

be shown that Hughes had actual knowledge of the specific danger posed by the existence of an electrical powerline in the excavation where he was working.[48] If he did not, whether he could have discovered the danger is not relevant to the defense.

The record reflects that at least one of Hughes' coworkers was unaware of the powerline and that there was no discussion of it at the jobsite prior to the accident. Sinnett, one of Hughes' coworkers who witnessed the accident, testified that he had been employed by Burton for 2 weeks prior to the accident and had received no training on the subject of underground utility markings. Sinnett also testified that he did not realize the significance of the color markings at the time of the accident and did not receive training on this subject until after the accident occurred. He testified that he did not discuss the markings with Hughes on the day of the accident and did not know if Hughes understood their significance. Sinnett further testified that he did not know what any of the conduits contained and that it did not occur to him that cutting into one of them could be hazardous. Barrett, another Burton employee who witnessed the accident, testified that there had been no discussion involving Hughes regarding the presence of an electrical line in the excavation and that Hughes had joked that the line he was about to cut could be a waterline. The conduits all looked the same and were not marked to identify their contents.

The issue before us in this appeal is not whether Hughes was negligent in cutting into one of the conduits before it was identified, but whether he actually knew that his action could have a fatal consequence because of the presence of an electrical line among the conduits in the excavation. From this record, a finder of fact could reasonably infer that Hughes did not have such knowledge. The evidence that Burton instructed its employees not to cut into unidentified underground lines, including Morse's warning that one "could be electrocuted" if he did so, could be viewed as a reference to the general risk of working around unmarked utility lines, as opposed to a specific warning that the excavation at 120th Street and Miracle Hills Drive actually contained an electrical powerline.

---

[48] See *Pleiss v. Barnes, supra* note 42.

We are not persuaded by RDC's argument that two of our prior decisions involving injuries caused by overhead electrical powerlines support its position that Hughes assumed the risk of electrocution as a matter of law. In *Rodgers v. Chimney Rock P.P. Dist.*,[49] we affirmed a finding by the trial court that the plaintiff's decedent had assumed the risk of electrocution when he used a long metal pipe to clean a well situated beneath the powerline. Applying a standard of review requiring deference to the factual findings of the trial court, we noted evidence that the powerline had been in place for approximately 15 years prior to the accident and that the plaintiff's decedent knew of its existence and the danger which it posed at the time of the accident. We held that the evidence was sufficient to support the trial court's finding of contributory negligence and assumption of risk. *Rodgers* differs from the instant case both in the procedural posture in which it reached this court and in the uncontroverted nature of the evidence regarding the accident victim's knowledge of the specific danger posed by the electrical lines in the area where he was working. Although our opinion in *Disney v. Butler County Rural P. P. Dist.*[50] mentions the governing principles of assumption of risk, it affirmed the trial court's dismissal of a personal injury claim "primarily on the ground that the plaintiff was guilty of contributory negligence as a matter of law." We noted that the plaintiff was at all times aware of the 7,200-volt powerline traversing his yard and driveway and that he failed to exercise due care in operating power equipment in its vicinity. No issues of contributory negligence are before us in this appeal.

The governing standard of review for an order of summary judgment should be, and continues to be, one favorable to the nonmoving party.[51] Applying this standard, which requires that we view the evidence in a light most favorable to the party against whom the summary judgment is granted and give such

[49] *Rodgers v. Chimney Rock P.P. Dist.*, 216 Neb. 666, 345 N.W.2d 12 (1984).

[50] *Disney v. Butler County Rural P. P. Dist.*, 183 Neb. 420, 421, 160 N.W.2d 757, 758 (1968).

[51] *Controlled Environ. Constr. v. Key Indus. Refrig.*, 266 Neb. 927, 670 N.W.2d 771 (2003).

party the benefit of all reasonable inferences deducible from the evidence, we conclude that there are genuine issues of material fact on the issue of whether Hughes knew and appreciated the specific danger posed by the underground electrical line when he took the action which resulted in his death. For this reason, the district court erred in concluding as a matter of law that by such action, Hughes assumed the risk of fatal injury.

## V. CONCLUSION

Because we conclude as a matter of law that OPPD did not owe a duty to Hughes under the circumstances of this case, we affirm the judgment of the district court in case No. S-05-1223. However, because we conclude that there are genuine issues of material fact as to the question of whether Hughes assumed the risk of injury, we reverse the judgment entered in favor of NebCom and RDC in case No. S-06-216 and remand the cause to the district court for Douglas County for further proceedings.

JUDGMENT IN NO. S-05-1223 AFFIRMED.
JUDGMENT IN NO. S-06-216 REVERSED,
AND CAUSE REMANDED FOR FURTHER
PROCEEDINGS.

CONNOLLY, J., dissenting.

The assumption of risk doctrine applies a subjective standard, geared to the individual plaintiff and his or her actual comprehension and appreciation of the danger he or she confronts.[1] The assumption of risk defense requires that (1) Nickolas J. Hughes knew of and understood the specific danger; (2) Hughes voluntarily exposed himself to the danger; and (3) Hughes' injury or death occurred from his exposure to the danger.[2]

The majority decision defines the "specific danger" as the danger that at least one of the conduits in the excavation contained electricity sufficient to cause injury or death. I would define the specific danger confronting Hughes differently than

---

[1] *Burke v. McKay*, 268 Neb. 14, 679 N.W.2d 418 (2004). See *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000).

[2] Neb. Rev. Stat. § 25-21,185.12 (Reissue 1995). See, also, *Burke v. McKay, supra* note 1.

the majority. I believe the specific danger was that Hughes could be electrocuted or killed if he cut one of the four unidentified conduits in the 120th Street excavation. I disagree that Hughes must have known there would *actually* be electricity in a conduit to have assumed the risk of electrocution or death. I believe Hughes could assume the risk of being electrocuted simply by knowing that any conduit at that particular site, if cut, could be deadly. Further, the evidence shows that Hughes knew of the specific danger involved in cutting the exposed conduit at the 120th Street jobsite and assumed the risk of his actions.

In concluding that genuine issues of material fact exist regarding whether Hughes knew of the risk posed by the electrical line, the majority opinion discusses the deposition testimony of Hughes' colleagues. As the majority opinion acknowledges, Patrick Morse's testimony supports an inference that Hughes was aware of the specific danger. Morse testified that the day before the accident, he warned Hughes not to cut into any line until it had been identified. The morning of the accident, he again warned Hughes not to cut into anything. The record shows the following exchange:

[Counsel for NebCom:] Did you tell him not to cut into anything or do anything else until after the utilities specifically identified which line was which?

[Morse:] Correct.

Q. He responded by saying I won't do that or what did he say?

A. Yes, I would use them words, yes, he did, he said okay, I won't.

Q. All right.

A. I was pretty adamant about it.

Q. So you believe you made it crystal clear to him that he absolutely should not do that?

A. Yes.

Q. Do you have any question in your mind that he understood what you were telling him?

A. There is no question in my mind. He understood what I told him.

More important, Morse testified that during his conversations with Hughes, they discussed that they would not cut into the lines before they were identified because they would not "want to get killed" and that one "could be electrocuted."

I believe the warnings Hughes received established that he knew of the specific dangers of electrocution or death associated with cutting an unidentified conduit at the 120th Street jobsite. Although the majority opinion suggests that Morse's warning about electrocution could be viewed as a reference to the general risk of working around unmarked utilities, I disagree. The conversations that took place show that Morse's warnings undoubtedly focused on the specific danger at the 120th Street jobsite.

Further, other evidence the majority opinion cites regarding Hughes' knowledge is irrelevant. The majority opinion reasons that because one of the other employees present when the accident occurred did not know that cutting a conduit could be dangerous, a jury might infer that Hughes also did not know of the danger. Another person's knowledge or lack thereof, however, has no bearing on what Hughes knew. Whether the employees discussed the risk among themselves before the accident also does not show what Hughes knew. Hughes' remark that the line he was about to cut could be a water line demonstrates that despite Morse's warnings, Hughes had decided to cut into a line that he had not positively identified. This does not support an inference that he either did or did not understand the risk associated with his decision.

I believe that the evidence concerning Hughes knowledge of the risk he encountered shows that he knew and understood that cutting a conduit before identifying it could have fatal consequences. And the evidence the majority opinion cites to oppose this view is not germane to whether Hughes subjectively appreciated the danger. I would affirm the district court's decision that Hughes assumed the risk of his actions.

HEAVICAN, C.J., joins in this dissent.